# Child Development Center (CDC) Operating Manual

## Child Abuse Prevention, Education, and Reporting (CAPER) Standards

### April 2016









# Table of Contents

**Chapter 1: Introduction** _____ **1**

**1.1  Intent of CAPER Standards** ................................................................. 1

**1.2  Definitions** .......................................................................................... 2

    1.2.1  Child Abuse ...........................................................................................2

    1.2.2  Child Neglect .........................................................................................5

    1.2.3  Contexts for Abuse: Familial, Extra-Familial, and Institutional ...........8

**1.3  Distinguishing Between Institutional Abuse and a CYP Policy Violation** ............. 8

    1.3.1  Meeting the Intent and Criteria for Reportable Institutional Abuse ................9

**1.4  Roles and Responsibilities** ................................................................. 10

    1.4.1  CDC Staff Responsibilities ...................................................................10

    1.4.2  Navy and Community Partner Roles and Responsibilities....................15

**Chapter 2: Prevention** _____ **18**

**2.1  Accountability and Supervision** ........................................................ 18

    2.1.1  Accountability Mandate......................................................................19

    2.1.2  Accountability Strategies.....................................................................19

    2.1.3  Supervision for Safety .........................................................................21

**2.2  Interactions and Relationships** ......................................................... 21

    2.2.1  Inappropriate Interactions..................................................................22

    2.2.2  Inappropriate Touch and the Navy CYP Guidance and Touch Policy ..............23

**2.3  Workplace Stress (Prevention and Early Intervention)** ..................... 24

    2.3.1  Signs of Workplace Stress....................................................................24

    2.3.2  Strategies for Preventing Stress-Related Interactions.........................25

    2.3.3  Colleague Support and Examples of Effective Intervention ................27

**Chapter 3: Education** _____ **28**

**3.1** **CAPER Training for CDC Professionals** .................................................................. **29**

    3.1.1   Formal CAPER Training........................................................................29
    3.1.2   Ongoing Support and Retraining ........................................................29
    3.1.3   CAPER Training for Families ................................................................30

**Chapter 4: Reporting** _____ **32**

**4.1** **Mandated Reporter Process** ....................................................................... **33**

    4.1.1   Reporting Steps: CONUS.....................................................................33
    4.1.2   Reporting Steps: OCONUS..................................................................34
    4.1.3   Mandated Reporter Scenario .............................................................35
    4.1.4   Reporting Considerations ...................................................................35
    4.1.5   Confidentiality in Reporting ...............................................................38

**4.2** **Additional Management Team Reporting Responsibilities**................................ **38**

    4.2.1   CNIC Notification...............................................................................38
    4.2.2   NAEYC Notification............................................................................39

**Chapter 5: Child Maltreatment Assessments, Investigations, and Communication Procedures** _____ **43**

**5.1** **FAP Assessments and CPS Investigations** .......................................................... **43**

**5.2** **Immediate Action Required by the CDC Director** ............................................. **44**

    5.2.1   Staff Removal/Reassignment in Reports of Institutional Abuse .........................44
    5.2.2   CDC Director Review Responsibilities ................................................45

**5.3** **CAPER-Related Communication** ...................................................................... **45**

    5.3.1   Familial and Extra-Familial Abuse ......................................................45
    5.3.2   Allegations of Institutional Abuse ......................................................46

**Chapter 6: CYP Policy Violations** _____ **49**

**6.1** **CYP Policy Violations and Review Process**......................................................... **49**

    6.1.1   CYP Policy Violation Scenarios ...........................................................49
    6.1.2   The Review Process............................................................................51

**6.2** **Actions to Mitigate Further Policy Violations** ....................................................... **51**

    6.2.1   Personnel Action...............................................................................52
    6.2.2   Corrective Action Plan .......................................................................54

**Appendix A: Additional Resources** ........................................................**A-1**

**Appendix B: Sample Corrective Action Plan for NAEYC Submission** ........................**B-1**



# **Chapter 1:** Introduction

Child and Youth Program (CYP) Professionals develop strong, caring relationships with children and their families, and spend the day engaged with children in both child care and protection. Subsequently, the Navy expects CYP Professionals to provide a safe, nurturing environment for all CYP children, to have the training and education to recognize and respond to child maltreatment, and to report all concerns for children's safety and well-being appropriately. All CYP Professionals not only have an ethical and professional responsibility to carry out these duties, but they also have a legal mandate to report child abuse and neglect they suspect by caregivers, either in the home or within the Child Development Center (CDC) program. Therefore, Navy CYPs must support its professionals through comprehensive and coordinated policy development and operational implementation, referred to as *C*hild *A*buse *P*revention, *E*ducation, and *R*eporting (CAPER). These Standards describe not only the roles, responsibilities, and operational requirements for CAPER, but also the best practices and strategies that support effective CAPER implementation.

CYPs are vital contributors to the safety and well-being of the Navy's children and youth. However, they do not operate in isolation. These Standards not only provide instruction for CYPs to meet their CAPER requirements, but they also describe key Navy and local community partners, their roles and responsibilities, and how they support CYP Professionals in keeping children and youth safe.

## 1.1  Intent of CAPER Standards

These Standards set forth the roles, responsibilities, and operational requirements for CAPER in CDCs.

**All information contained herein is official Navy guidance. These Standards shall serve as the Standard Operating Procedure (SOP) for all CAPER-related requirements and must be followed unless otherwise noted**.

The core components of CAPER are detailed below.

***Prevention*** refers to the safeguards put into place to minimize the risk of harm and maximize CYP's protective capacity for all children in care. In these Standards, prevention focuses on making the CYP environment safe and nurturing for all children and includes ensuring safe physical spaces and supervision through proper staff:child ratios and strict Line of Sight Supervision (LOSS) policies for all provisional employees, visitors, and volunteers. Prevention also involves ensuring positive, nurturing, and developmentally appropriate interactions between children and staff.

***Education*** refers to the process of equipping all CDC Professionals with the knowledge, skills, and ability to identify potential child maltreatment and take appropriate action. It includes opportunities for practical application in a structured learning environment. It also refers to increasing families' knowledge of children's developmental needs, child risk and protective factors, child maltreatment reporting, and the Navy and community resources available to support families.

***Reporting*** refers to the actions required when a CDC Professional suspects that a child is being harmed or is at risk of future harm. All CDC Professionals are **mandated reporters** of child maltreatment and, as such, are required by law to report in good faith any suspected instances of child maltreatment. In addition to the requirements of mandated reporting of child maltreatment, the CDC Director must also report any critical incidents to the Commander, Navy Installations Command (CNIC) and the National Association for the Education of Young Children (NAEYC), if applicable.

In addition to the core CAPER components, these Standards also delineate the CDC Director's responsibilities relative to the review of all Navy CYP policy violations as well as CAPER-related communication procedures.

## 1.2   Definitions

CAPER is an area of program operations that requires engagement with both Navy and civilian child protection agencies. Consequently, CDC Professionals must be fluent in common CAPER-related terminology and concepts within and outside of the Navy community. Throughout the field of child welfare, **child maltreatment refers to abuse or neglect of a child younger than age 18** by a parent, caregiver, or other person in a caregiving role. CDC Professionals are all considered to be persons in a caregiving role.

Within the Navy CYP community, the term "child abuse" is informally used as a catchall term to refer to both child abuse and neglect. However, child abuse and child neglect are distinct terms referring to specific actions or inactions that harm or place a child at risk for harm. As such, to ensure consistency and clarity, these Standards will use the broader term "child maltreatment" to capture both child abuse and neglect. The terms "child abuse" and "child neglect" will be used as they are defined below.

---

### Child Maltreatment

*"Child Maltreatment is the physical or sexual abuse, emotional maltreatment or neglect of a child by a parent, guardian, foster parent or by a caregiver, whether the caregiver is interfamilial or extra-familial, under circumstances indicating the child's welfare is harmed or threatened. Such acts by a sibling, other family member, or other person shall be deemed to be child maltreatment only when the individual is providing care under express or implied agreement with the parent, guardian, or foster parent."*
*(OPNAVINST 1752.2)*

---

### 1.2.1   Child Abuse

**Child abuse** generally refers to **non-accidental acts** by a parent or caregiver that cause harm to a child, regardless of whether the parent or caregiver intended to cause harm. There are three main forms of child abuse:

***Physical abuse*** includes "…grabbing, pushing, holding, slapping, choking, punching, kicking, sitting or standing upon, lifting and throwing, burning, immersing in hot liquids or pouring hot liquids upon, hitting with an object (such as a belt or electrical cord), and assaulting with a knife, firearm, or other weapon that

may cause bodily injuries. . . An injury does not have to be visible for physical abuse to have occurred." (Office of the Chief, Naval Operations Instruction [OPNAVINST] 1752.2).

**Sexual abuse** includes activities such as fondling a child's genitals, penetration, incest, rape, sodomy, indecent exposure, and exploitation through prostitution or the production of pornographic materials. Sexual abuse can include both touching and non-touching behaviors. Touching behaviors may involve touching of the vagina, penis, breasts, or buttocks; oral-genital contact; or sexual intercourse. Non-touching behaviors can include voyeurism (i.e., looking at a child's naked body for sexual gratification), exhibitionism, or exposing the child to pornography.

**Psychological/Emotional abuse** includes "…acts or a pattern of acts, omissions or a pattern of omissions, or passive or passive-aggressive inattention to a child's emotional needs resulting in an adverse effect upon the child's psychological well-being. Emotional abuse might also include intentional berating, disparaging, or engaging in other verbally abusive behavior toward the child, and violent acts which may not cause observable physical injury." Emotional/Psychological abuse is often difficult to prove; however, it is almost always present when other forms of child maltreatment are present. Emotional abuse (or psychological abuse) is a pattern of behavior that impairs a child's emotional and cognitive development or sense of self-worth.

Visual signs and symptoms as well as marked changes in behavior, can be indicators that a child has experienced abuse. CDC Professionals must be able to recognize both the signs and symptoms of child abuse as well as high-risk situations (e.g., volatile home environments, parent substance abuse, concerning parent–child interactions). Considering all variables may prove helpful in determining whether a child has been harmed or is at risk for harm. The following are some child indicators that may raise suspicions of child abuse, particularly if more than one indicator is present.

**Exhibit 1.2.1A: Possible Child Abuse Indicators**

| Type of Abuse | Possible Indicators |
|---|---|
| **Physical** | ‣ Extensive bruises, especially in areas of the body that are not normally vulnerable |
| | ‣ Frequent bruises, particularly on the head or face, the abdomen, or midway between the wrist and elbow |
| | ‣ Bruises in specific shapes, such as handprints or belt buckles |
| | ‣ Frequent bruises, particularly on the head or face, the abdomen, or midway between the wrist and elbow |
| | ‣ Marks that indicate hard blows from an object like an electrical cord |
| | ‣ Bruises on multiple parts of the body |
| | ‣ Bruises or welts in various stages of healing |
| | ‣ Being aggressive, oppositional, or defiant |
| | ‣ Cowering or demonstrating fear of adults |
| | ‣ Exhibiting destructive or abusive behaviors toward oneself, others, or animals/pets |
| | ‣ Reluctance to go home, which may indicate a possible fear of abuse at home |
| | ‣ Shrinking or wincing when being admonished or when an adult approaches |
| | ‣ Exhibiting anxiety or being unusually fearful |
| **Sexual** | ‣ Cuts, bruises, or bleeding in the genital area |
| | ‣ Infection in the genital area |
| | ‣ Pain in the genital area when sitting or moving around |

| Type of Abuse | Possible Indicators |
|---|---|
| | ▸ Withdrawn behavior |
| | ▸ Angry outbursts |
| | ▸ Exhibiting anxiety or being unusually fearful |
| | ▸ Exhibiting depression |
| | ▸ Not wanting to be left alone with a particular individual(s) |
| | ▸ Sexual knowledge, language, and/or behaviors that are inappropriate for the child's age |
| **Emotional** | ▸ Self-abusive behaviors (e.g., head banging, pulling one's hair) |
| | ▸ Speech disorders |
| | ▸ Repetitive habits/behaviors (e.g., biting, rocking) |
| | ▸ Failure to thrive due to nonmedical causes |
| | ▸ Extremes in behaviors (e.g., very aggressive or extremely passive) |
| | ▸ Excessive dependence on adults |
| | ▸ Crying easily |
| | ▸ Withdrawal or decreased social interaction with others |

## Developmentally Appropriate Behavior vs. Abuse Indicators

As young children explore the world around them and test their developing skills, they may engage in behaviors or show signs of injury that are similar to some indicators of child maltreatment. CAPER training describes common behavioral indicators and teaches CDC Professionals how to assess these behaviors in the context of the child's whole environment and developmental stage. CDC Professionals should consider a child's behavior in the context of their age, development, and environmental factors to determine whether such indicators support suspicions of child maltreatment.

For example, some sexual curiosity in preschoolers may be developmentally appropriate. The following examples of child play warrant intervention by the CDC Professional; however, they are developmentally normal:

▸ Paul and Jenny, both 3-years-olds, are found pulling their pants down and touching each other on their private parts. Both are giggling and very interested in how the other's body is different from theirs.

▸ Lately, Billy, a 4-year-old in half-day preschool, has been sneaking into the girls' bathroom to watch the girls go potty. Now he has recruited his friend, Eddie, to do it, too.

In the examples above, a CDC Professional should intervene and redirect the children's play; however, without other indicators of abuse, these examples illustrate developmentally appropriate curiosity.

A child acting in a sexual manner **is not** developmentally appropriate. For example, it **is not** developmentally appropriate for a 4-year-old child to describe a sex act or imitate sexual intercourse with another child. These scenarios can be cause for suspicions of child sexual abuse, especially if other indicators are present.

In the case of physical abuse, young children who are excited to explore their environment may experience bumps and bruises. For example:

▸ Two-year old Molly, who is a well-adjusted happy child, arrives at the CDC with bruising and scrapes on both knees and a purplish-blue bruise on her forehead. Molly's mother tells her teacher that yesterday when they arrived home, Molly ran down the driveway, tripped, and fell.

This example presents as a developmentally plausible accident.

In contrast, a child that has clearly distinguishable hand-shaped bruises along with signs of fear and anxiety may warrant suspicions of an act of physical abuse.

The welfare and safety of the child is always paramount. As such, if the CDC Professional suspects any child maltreatment and feels the child is at risk, he/she must report that suspicion. Chapter 4: Reporting in these Standards details the mandated reporter process. When in doubt, the CDC Professional should consult with the Family Advocacy Representative (FAR), CDC Director, or both to determine whether a suspicion meets the threshold for reportable child maltreatment.

## 1.2.2   Child Neglect

**Child neglect** is a form of child maltreatment that refers to a parent or caretaker's **failure or omissions** in meeting a child's basic needs for healthy growth, development, and supervision. Neglect is typically characterized by an ongoing pattern of inadequate care or care which is not age-appropriate. Child neglect may be:

▸ Physical, such as the failure to provide adequate nourishment, shelter, appropriate clothing, or age-appropriate supervision;

▸ Medical, referring to the failure to provide necessary medical or mental health treatment;

▸ Educational, such as the failure to educate a child or address a child's special education needs; and/or

▸ Emotional, involving inattention to a child's emotional needs or failure to provide psychological care. It typically involves one or all of the following: disregard (consistent failure to respond to the child's need for stimulation, nurturance, encouragement, and protection, or failure to acknowledge the child's presence); rejection (actively refusing to respond to the child's needs, such as withholding all attention or affection); and/or isolation (preventing the child from having normal social contacts with other children and adults).

As with physical, sexual, and emotional abuse, the key criterion for assessing child neglect is whether the deprivation has or may cause harm to the child. Many isolated omissions, such as forgetting to provide a child with lunch one day or missing a child's dental appointment, occur over the course of parenting and would not cause harm to a child.

Also, if a family is struggling to provide appropriate nourishment to a child due to financial hardship, and that is the only indicator of concern, it may be appropriate to ***first*** refer them to available on or off-base resources to address their needs. It is important to keep that criterion in mind when assessing any suspicions of child neglect.

There are two main types of harm from child neglect: immediate and cumulative.

▸ **Immediate neglect:** In a case of immediate neglect, a single failure of a parent or caregiver to supervise or care for a child could cause very serious and immediate child harm, including death. Examples of

immediate child neglect include leaving an infant or toddler in a closed car on a hot day to run into a store or not taking a seriously injured child to the hospital. Given the risk of immediate harm, one such incident would meet the definition of child neglect.

▸ **Cumulative neglect:** More often, however, the act of child neglect is less overt, and is typified by repeated or chronic failures to provide for a child's basic needs, thus causing cumulative harm to the child. Child neglect can negatively impact all aspects of a child's development: social, emotional, cognitive, and physical.

As with child abuse, visual signs and changes in behavior may indicate that a child has been neglected. CDC Professionals must be able to recognize both the signs and symptoms of child neglect as well as high-risk situations (e.g., troubled home environment, parent/caregiver substance abuse, poor parent/caregiver-child interactions). Considering all variables may prove to be helpful in determining whether a child has been harmed or is at risk for harm. The following are some child indicators that may raise suspicions of child neglect, particularly if more than one indicator is present.

#### Exhibit 1.2.2A: Possible Child Neglect Indicators

| Type of Neglect | Possible Indicators |
|---|---|
| **Physical** | ▸ Consistent lack of parent/caregiver supervision |
| | ▸ Consistent hunger |
| | ▸ Steals food, or begs for food from classmate(s) |
| | ▸ Nutritional deficiencies |
| | ▸ Inappropriate dress for the weather conditions |
| | ▸ Poor hygiene or lacking a basic understanding of hygiene |
| | ▸ Regularly displaying fatigue or listlessness, falling asleep in class |
| | ▸ Reporting that no caregiver is at home |
| **Educational** | ▸ Lack of follow-up for identified developmental needs |
| | ▸ Irregular attendance or nonattendance at school or child care |
| **Emotional** | ▸ Excessive clinginess or distress at leaving the CDC |
| | ▸ Behavioral outburst or poor social skills |
| | ▸ Lack of empathy or other displays of poor emotional development |
| | ▸ Displaying self-destructive behaviors |
| | ▸ Being very demanding of affection or attention |
| **Medical** | ▸ Untreated or unattended medical or dental needs, such as persistent (untreated) conditions (e.g., scabies, head lice, diaper rash or other skin disorders) |

As discussed previously, neglect is often more difficult to identify and its indicators may be more subtle than other types of abuse. Based on the key elements of neglect—risk of harm and a pattern of failing to meet the needs of the child—the following examples provide additional considerations for identifying child neglect.

▸ Leaving a toddler home alone or in an area of the CDC without adult supervision. This can be dangerous because toddlers like to explore their environment; however, they do not recognize potential dangers (e.g., filling a bathtub with water, turning on a stove, sticking an object in an electrical outlet), and they are not able to call for help.

‣ Failure to obtain immediate medical attention for any child with a serious injury (e.g., broken bone, head injury, deep cut, serious burn).

‣ Failure to protect any child from sexual advances or contact by another adult (e.g., significant other, stepparent, uncle) in the home.

‣ Repeated failure to participate in school meetings (e.g., to develop an Individualized Education Plan) or obtain a professional evaluation for any child who is suffering educationally after CDC staff have relayed or attempted to relay that the child appears to have learning disabilities or other special needs.

‣ Chronic substance abuse that causes sporadic or repeated lapses in parenting judgment, such as failures to dress a child in weather-appropriate clothes, send a school age child to school, pick a child up from the CDC, provide meals for a child, keep hazardous objects out of children's sight or reach, or otherwise maintain a clean, safe home environment.

A CDC Professional may also encounter instances of immediate neglect. For example: A CDC Professional suspects that a parent, arriving to pick up his/her child from the CDC, is impaired from alcohol, drugs, or symptoms of a serious mental or physical illness, and believes that it would be unsafe to release a child to the parent. In this instance, the CDC Professional must immediately express that concern with the parent and request permission to contact the child's other parent or an emergency contact to pick up the child. If the CDC Professional is in the classroom at the time the concern is observed, he/she should immediately call for assistance from a Management Team member or lead in order to take appropriate action. If the parent refuses assistance and insists on leaving with the child, a member of the Management Team must first notify base security or local police (if program is located off-base) immediately of the situation, especially if the parent is driving a vehicle. The CDC Professional must then report the situation immediately via the mandatory reporting procedures detailed in Chapter 4: Reporting.

## *Witnessing Domestic Violence*

CDC Professionals who suspect that a child is being exposed to domestic violence must report it as suspected child maltreatment. The Department of Defense (DoD) provides the following definitions for domestic abuse and domestic violence, respectively:

> Domestic violence includes any behaviors that intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, threaten, blame, hurt, injure, or wound someone.
>
> - *U.S. Department of Justice, Office on Violence Against Women*

**Domestic abuse** is a pattern of behavior resulting in emotional/psychological abuse, economic control, and/or interference with personal liberty that is directed toward a person who is a current or former spouse, a person with whom the abuser shares a child in common, or a current or former intimate partner with whom the abuser shares or has shared a common domicile.

**Domestic violence** is the use, attempted use, or threatened use of force or violence against a person, or a violation of a lawful order issued for the protection of a person who is a current or former spouse, a person with whom the abuser shares a child in common, or a current or former intimate partner with whom the abuser shares or has shared a common domicile.

Children who witness domestic violence **may be at risk of physical and emotional harm**—either accidentally or deliberately. Domestic violence presents an unsafe environment for children in which they may be specific targets for violence or they may become harmed by trying to defend or protect the victim. Domestic violence not only threatens a child's physical well-being, but also their emotional and

psychological well-being, which may be less obvious, but often manifests as depression, aggression, learning difficulties, nightmares and sleeplessness, anxiety, or intense worry for their safety or the safety of a parent.

See Chapter 4: Reporting for more information on the process for reporting suspected child maltreatment.

### 1.2.3   Contexts for Abuse: Familial, Extra-Familial, and Institutional

CDC Professionals working with children may encounter child maltreatment in three distinct contexts: familial, extra-familial, and institutional.

**Familial abuse:** Child maltreatment that occurs in a setting where the parent or primary custodian (e.g., grandparent) is caring for, or supervising, the child.

**Extra-familial, criminal harm:** When anyone other than the child's parent or caregiver (e.g., a sibling, extended family member, stranger) harms the child.

**Institutional abuse:** In the context of this operating manual (OM), child maltreatment that occurs within a CYP and is perpetrated by a CYP Professional is referred to as "institutional abuse." Settings in which institutional abuse may occur include CDCs, Child Development Homes, Youth Programs, School Age Care programs, and foster care placements. Within Navy CYP settings, cases of institutional abuse are relatively rare compared to incidents that violate CYP policy alone but do not meet the threshold for child abuse or neglect. The key criterion for distinguishing between institutional abuse (child maltreatment) and CYP policy violations is whether the act or omission caused **harm to the child or placed the child at risk for harm**.

**Regardless of the context for the abuse**, CDC Professionals are required to report any suspected incidents of child maltreatment. Again, the primary criterion for determining whether a situation warrants reporting is whether the child is in immediate harm or at risk for future harm.

Chapter 4: Reporting provides more information about how CDC Professionals determine when to report suspected child maltreatment. Chapter 6: CYP Policy Violations discusses the process for reviewing and taking action against violations of Navy CYP policy, regardless of whether an official child maltreatment report is substantiated.

## 1.3   Distinguishing Between Institutional Abuse and a CYP Policy Violation

Defining and identifying reportable child maltreatment may be a difficult and potentially upsetting process. No one wishes to see a child harmed or in danger of harm and CDC Professionals may be eager to address or eliminate threats as soon as conceivably possible. Conversely, it may be difficult for many dedicated caregivers to believe that a colleague could purposefully or willfully abuse or neglect a child. In the context of CYP, evidence indicates that instances of CYP policy violations are far more common than instances of institutional abuse (child maltreatment). And while **all** instances of ***substantiated*** institutional abuse involve CYP policy violations, not all instances of CYP policy violations meet the intent and criterion for reportable child maltreatment. It is essential for CDC Professionals to discern the difference and ensure that all scenarios are properly identified and addressed, either via reporting in cases of institutional abuse (see

[Chapter 4: Reporting](#)) or by internal investigation and corrective or personnel actions in cases of CYP policy violations (see [Chapter 6: CYP Policy Violations](#)).

The key criterion for distinguishing between suspicions of institutional abuse (child maltreatment) and that of a CYP policy violation (that does not meet the criteria of child maltreatment) is whether the act or omission caused **harm to the child or put the child at risk for harm.** In instances of CYP policy violations, program quality standards may not have been met and/or required procedures or practices may not have been followed; however, a child was not harmed. A CDC Director or CYP Professional should also weigh the following to help discriminate between the two:

▸ **How old is the child?** The level of physically appropriate touch for an infant is dramatically different from what one should use with a preschooler.

▸ **Where did the incident occur?** An infant left unattended in a crib is not at the same level of risk of harm as a preschooler left alone on a bus.

▸ **How long did the incident last?** Depending on the age of the child and the location, a few minutes of inattention may pose minimal risk or may pose an immediate risk of harm to the child.

▸ **What are the circumstances surrounding the incident?** Grabbing a child who is about to run in front of a friend on the swings is contextually different from grabbing a child who is not listening to instructions.



When in doubt, the CDC Professional, including the Director, may reach out to FAR for guidance. CDC Professionals must assess **all** available information and resist relying on any single indicator when making a decision about whether to report a CDC Professional's behavior as possible child maltreatment.

Regardless of whether an incident rises to the threshold of reportable child maltreatment, the CDC Director must investigate all instances of Navy CYP policy violations (see [Chapter 6: CYP Policy Violations](#)).

## 1.3.1  Meeting the Intent and Criteria for Reportable Institutional Abuse

CDC Directors have been hired to make appropriate and often tough decisions. CDC Directors must use their training and expertise to determine when a Navy CYP policy violation meets the criterion of a reportable incident of institutional abuse (child maltreatment): a child has been harmed, or is likely to be harmed, due to an overt act or omission of action *by the CDC Professional (who is acting in the caregiver role).* (**Note**: **All** employees, contractors or volunteers of the CDC are considered as *acting in a caregiver role* since that is the purpose of the CDC program). CDC Directors should not automatically report all CYP policy violations to the FAR and Child Protective Services as a case of suspected child maltreatment nor should they hesitate to report incidents of child maltreatment when appropriate. The consequences of making a decision without thoughtfully considering the criteria for reportable child maltreatment are significant and severe. If a scenario is indeed an incident of child maltreatment, a child's welfare may be compromised and a child could be at risk for further harm if the incident is not reported and the CDC Professional is not

properly investigated. If a scenario is a CYP policy violation and it is not an incident of child maltreatment, the CDC Professional's career may be irreparably harmed if it is incorrectly or hastily reported as an incident of child maltreatment. As such, CDC Directors must take care in assessing each situation to ensure that they are taking appropriate action in good faith (see Chapter 4: Reporting).

**Note:** Regardless of whether it meets the criterion for institutional abuse, **all** violations of CYP policy **must** be investigated and appropriate corrective action taken to mitigate future violations. See Chapter 6: CYP Policy Violations for more information.

# 1.4  Roles and Responsibilities

All Navy personnel, including CDC Professionals, have an independent duty to report any suspicions of child maltreatment as detailed in Chapter 4: Reporting of these Standards. Furthermore, CDC Management Team members, Training Team members, teachers, support staff, and volunteers, in coordination with other Navy and local community agencies, have mutually supportive roles and responsibilities that help CDC operations effectively implement CAPER.

> **All CYP Professionals Are Mandated Reporters of Child Maltreatment**
>
> All Department of the Navy (DoN) personnel, including CYP Professionals, must report any suspicions of child maltreatment regardless of whether they are on or off duty. This duty cannot, under any circumstances, be delegated to another individual. Failure to report is a serious violation of the law.

## 1.4.1  CDC Staff Responsibilities

This section identifies specific CDC roles and responsibilities for implementing, monitoring, and supporting CAPER. See the CDC Operating Manual Introduction for all CYP role definitions and descriptions.

### *CDC Director and the CDC Management Team*

The CDC Management Team is responsible for oversight, quality assurance, and monitoring support staff in meeting all CAPER requirements.

**Management Team**

The CDC Director has **overall responsibility** for managing a CDC that meets all program and policy requirements. The CDC Director must lead by example through his/her own personal conduct, self-management, and adherence to these Standards. The CDC Director sets the expectation that the program is a safe and nurturing environment for all participating children and their families. In addition, the Director should also promote and encourage open communication in which both CDC Professionals and families are comfortable discussing any concerns they may have with the CDC Director. This "open door" policy is instrumental in maintaining strong parent–CDC partnerships and staff comfort with both reporting suspected child maltreatment and trusting and supporting one another as a team of care providers.

For CDCs with an Assistant Director, all of the CDC Director responsibilities also apply to the Assistant Director. Ultimate responsibility for meeting all CYP program and policy requirements, however, rests solely with the CDC Director. CDC Directors' duties related to CAPER include the following:

## Prevention

▶ Ensure that CDC facilities meet or exceed health and safety standards as outlined in these Standards and Navy policies.

▶ Monitor (e.g., via daily classroom visits and observations) CDC Professionals' activities, interactions, and decision-making processes to continuously assess and communicate with the CDC Professional about his/her strengths, areas for improvement, and potential training refreshers or needs, and to ensure that quality assurance practices are in effect.

▶ Provide reasonable breaks to teachers to support their self-management and training needs, and to prevent or lessen workplace stress.

▶ Ensure that each CDC Professional receives a copy of the CDC CAPER Standards as part of orientation.

▶ Ensure that CDC Professionals receive continuing education in child development and early education, and apply the knowledge in their daily child-staff interactions. Request support and guidance from CNIC and other Navy partners, as needed, to help all staff fulfill their professional and legal duties.

▶ Promote an "open door" policy for both families and staff and serve as a resource and support during times of stress.

## Education

▶ Arrange for CDC Professionals to be trained to understand child maltreatment risk factors, distinguish risk from safety issues, help build protective (resiliency) factors through developmentally appropriate staff-child interactions, and recognize and respond promptly and correctly to indicators of potential harm.

▶ Arrange staff schedules or coverage in the CDC to allow all CDC Professionals to participate in required training.

▶ Ensure that all CDC Professionals master the CAPER core competencies and apply the knowledge in daily activities (e.g., via training observation, routine classroom observations, discussion and tips during staff meetings), providing additional coaching, guidance, and training, as needed.

▶ Provide opportunities (e.g., parent–teacher conferences, monthly newsletters, special celebrations) for ongoing parent/caregiver education and involvement.

## Reporting

▶ Post the <u>DoD Child Abuse and Safety Hotline Poster</u> and information as required per Navy policy and procedures (See <u>Section 3.1.3</u>).

▶ Complete and disseminate the <u>*Local CAPER Contact Information Supplement—CNICCYP 1700/56*</u>, which contains all current contact information for all relevant Navy personnel and State agencies involved in the reporting and investigation of child maltreatment as well as entities who provide family and child support services.

▶ Provide reporting guidance to any CDC Professional who requests or needs it, including contacting FAR for assistance as appropriate.

- If requested, help any CDC Professional who suspects child maltreatment to report it to the appropriate authorities. The CDC Director may not make a report on behalf of a CDC Professional, prevent a CDC Professional from making a report, or require advanced notification.

- Like all CDC Professionals, the CDC Director is a mandated reporter and, as such, has an independent duty to report all suspected child maltreatment (see Chapter 4: Reporting).

- Maintain the confidentiality of reports and investigations.

- Upon notice of any violation falling within these Standards, take immediate and concurrent actions to secure child safety, gather facts to determine and implement appropriate personnel action (see Chapter 6: CYP Policy Violations), and fulfill other reporting requirements to the Command, NAEYC, and CNIC (see Chapter 4: Reporting).

- Implement any corrective action.

**CAPER-Related Communication and Investigations**

- Conduct all required CAPER-related notifications (see Chapter 5: Child Maltreatment Assessments, Investigations, and Communication Procedures).

- Conduct all Navy CYP policy violation reviews and determine appropriate corrective and personnel action (in collaboration with local HR) to mitigate and prevent future occurrences of such violations (see Chapter 6: CYP Policy Violations).

### *CDC Training Team*

The Training Team is responsible for educating CDC Professionals to ensure they have the knowledge, skills, and ability to follow all Navy policies and procedures related to CAPER. A Training Specialist also works jointly with the CDC Director to identify and distribute CAPER resources and information for families.

Training Team

Specific Training Team responsibilities pertaining to CAPER include the following:

**Prevention**

- Offer training opportunities and resources to CDC Professionals and families that promote child maltreatment prevention (e.g., stress management, child developmental ages and stages).

- Conduct regularly scheduled and ad hoc observations of all CDC Professionals in day-to-day activities and provide support, coaching, and other guidance.

- Request support and guidance from the CDC Director and other Navy partners, as needed, to fulfill their professional and legal duties.

**Education**

- Deliver training, in collaboration with the Family Advocacy Program (FAP) and other local resource partners, to CDC Professionals on child maltreatment definitions, risk factors, protective (resiliency) factors, indicators, and reporting requirements. Infuse training with opportunities for practical application through role plays and other experiential learning techniques.

- Identify training and informational materials for families that promote knowledge of both healthy child development and child maltreatment, awareness of how to report suspected child maltreatment, awareness of Navy and local community family support resources, and awareness of CDC Professionals' duty to report all suspected child maltreatment.

- Maintain up-to-date knowledge of best practices for CAPER in CDCs. Share updates with CDC Professionals on an ongoing basis through support, coaching, guidance, and additional training.

- In collaboration with the CDC Director, monitor CDC Professionals' CAPER-related interactions and decision-making processes to determine strengths; concerns; and potential training refreshers, gaps, or needs.

**Reporting**

- Like all CDC Professionals, members of the Training Team are mandated reporters and, as such, have an independent duty to report any suspicions of child maltreatment and to maintain the confidentiality of reports and investigations (see Chapter 4: Reporting).

## Direct Care Staff



Direct Care Staff

Due to their close interactions with children and families, CDC Teachers have a critical role in providing a safe and healthy environment for children. CDC Teacher responsibilities include the following:

**Prevention**

- Engage in developmentally appropriate interactions with children and maintain the physical environment (e.g., accountability, supervision, visibility) in accordance with CYP policies and procedures to promote a safe and healthy environment.

- Self-monitor for signs of stress and burnout and help colleagues do the same to build a mutually supportive team.

- Request support and guidance from the CDC Director and other Navy partners, as needed, to fulfill professional and legal duties.

- Understand and build protective factors in children participating in the CDC program. Apply CAPER training and these Standards in everyday practice.

**Education**

- Attend and actively engage in all required CAPER training.

- Demonstrate comprehension of CAPER training and these Standards.

- Request additional training or guidance, as needed or desired, to build and maintain CAPER operating knowledge.

**Reporting**

- Use a holistic approach to gather a full understanding of the risk and protective factors for all children in all interactions.

- As mandated reporters, report all concerns for children's safety and well-being in accordance with child maltreatment reporting requirements (see Chapter 4: Reporting).
- Maintain the confidentiality of reports and investigations.

## CDC Support Staff

The responsibilities of CDC support staff (e.g., Operations Clerk, Food Service Workers, and Custodians) include the following:

**Support Staff**

### Prevention

- Maintain the physical environment in accordance with CYP policies and procedures.
- Visually observe what is taking place throughout the facility.
- Self-monitor for signs of stress and burnout and reach out to colleagues and the Management Team for support.
- Request support and guidance from CDC Teachers, the CDC Director, and other Navy partners, as needed, to fulfill professional and legal duties.

### Education

- Attend and actively engage in all required CAPER training.
- Demonstrate comprehension of CAPER training and these Standards.
- Request additional training or guidance, as needed or desired, to build and maintain CAPER knowledge.

### Reporting

- As mandated reporters, report all concerns for children's safety and well-being in accordance with all reporting requirements (see Chapter 4: Reporting).
- Maintain the confidentiality of reports and investigations.

## CDC Volunteers

CDC Volunteers, like paid CDC Professionals, have an important role in providing a safe and healthy environment for children. CDC Volunteer responsibilities include the following:

### Prevention

- Engage in developmentally appropriate interactions with children and maintain the physical environment (e.g., visibility) in accordance with CYP policies and procedures to promote a safe and healthy CYP environment.
- Self-monitor for signs of stress and burnout and reach out to CDC staff for support.
- Request support and guidance from CDC Teachers, the CDC Director, and other Navy partners, as needed, to fulfill professional and legal duties.

**Education**

‣ Attend and actively engage in all required trainings.

‣ Build and maintain knowledge of child maltreatment definitions and reporting requirements.

**Reporting**

‣ As mandated reporters, report all concerns for children's safety and well-being in accordance with all reporting requirements (see Chapter 4: Reporting).

‣ Maintain the confidentiality of reports and investigations.

## 1.4.2  Navy and Community Partner Roles and Responsibilities

Although CDC Professionals play a vital role in preventing child maltreatment, strengthening families, and protecting children, other Navy entities and community partners provide a constellation of support services that ensure CAPER success. The following Navy and community partners serve as key resources for CDC Professionals (e.g., guidance, referral sources, and stress management support) and families (e.g., guidance, education, direct services, respite and foster care). All CDC Professionals should be familiar with these important resources. The services offered by these partners can help families struggling with the unique stresses of military life (e.g., deployment, reintegration, post-traumatic stress) or everyday stresses (e.g., finances, family dynamics). These services can also help CDC Professionals struggling to manage stress. If a family or CDC Professional is struggling to manage stress, referring them to support services early, before unmanaged stress turns into uncontrolled frustration or anger, is an important component of child maltreatment prevention. The updated contact information for all Navy and community partners should be included in the *Local CAPER Contact Information Supplement—CNICCYP 1700/56*.

### *Fleet and Family Support Centers*

Fleet and Family Support Centers (FFSCs) support individual and family readiness through a full array of programs and resources that help Navy families to be resilient, well-informed, and adaptable. FFSC programs and services include the following:

‣ **Family Advocacy Program (FAP):** FAP provides a variety of intervention and treatment services, including counseling, clinical case management, and treatment groups to military members and their families involved in domestic abuse (i.e., child maltreatment or domestic violence). FAP also refers families to other military and civilian resources as appropriate. As part of its function, FAP provides expertise and guidance to CYPs on child maltreatment prevention, identification, education, and reporting, including (1) developing and implementing staff training; (2) developing educational materials for families and CDC Professionals; (3) identifying Navy and local community resources for families under stress; and (4) referring families to such resources, including CYP as one of the Navy supports available.

▸ **Family Advocacy Representative (FAR):** The local FAR is a licensed clinical provider within FAP, and is responsible for implementing and managing the clinical rehabilitative and intervention aspects of the local FAP. FAR serves as the CYP point of contact for all child maltreatment questions and reports (see Chapter 4: Reporting).

> The Family Advocacy Representative (FAR), a certified clinical provider within the Family Advocacy Program (FAP), is the CYP point of contact for all child maltreatment questions and reports.

▸ **New Parent Support Home Visitation Program (NPSHVP):** NPSHVP is a team of professionals that provide supportive and caring services to military families with children up to age 4. It was developed to assist military families in ways that friends and family would do if they were back home. Navy families and other military families expecting a child or with children up to 4 years of age are assessed to determine whether they need help managing the demands of a new child. In the program, new parents can be referred to community new parent support programs and they are eligible to participate in a voluntary home visitation program free of charge. This program offers expectant parents and parents of newborn and young children the opportunity to learn new skills as parents and to improve existing parenting skills in the privacy of their own homes.

▸ **Clinical Counseling:** FFSCs offer confidential counseling by licensed clinicians. Clinical counseling services are free of charge to active-duty personnel and family members.

## Military and Family Life Counseling (MFLC) Program

The DoD's MFLC program provides (1) confidential non-medical, short-term situational problem-solving counseling to service members and their families; and (2) education to help service members and their families understand the impact of stress, deployments, family reunions following deployments, and the stresses of military life. MFLC services augment existing military support services and offer flexible service delivery; services may be provided on or off military installations. The MFLC program includes a Children's Support Program to address the impact of military life on children.

> **CYP and Navy Program Partnerships to Promote Child and Family Safety and Well-Being**
>
> *The following example illustrates how CYP works with other entities to support families and protect children.*
>
> Since his father's deployment, 4-year-old Matt has been exhibiting aggressive behaviors at the CDC. One day, as Matt and his mother are leaving the CDC, the CDC Director observes Matt yell and hit his mother, and the mother smacks Matt's shoulder. The CDC Director calls FAR for a consultation. FAR agrees with the CDC Director that a report is not yet indicated; however, the family might benefit from MFLC or NPSHVP services. The CDC Director reaches out to an MFLC counselor working at CYP.
>
> With the mother's approval, the MFLC counselor works with Matt and his mother on appropriate coping skills when Matt becomes upset or frustrated. The MFLC counselor also conducts CDC-wide training on using social stories to help children identify and express their emotions in a positive manner. With the assistance of Matt's teacher and mother, Matt creates a social story about "Matt's Best School Day."

MFLC counselors can assist with enhancing life skills, such as decision-making, anger management, conflict resolution, parenting, parent–child communication, and relationship skills. MFLC counselors also can help with managing the dynamics associated with the military lifestyle, such as deployment stress, reintegration, relocation adjustment, separation, coping skills, homesickness, and loss and grief.

### State or Local Child Protective Services

Child Protective Services (CPS) refers to the State or local social services agency designated by law to receive and respond to all reports of suspected child maltreatment. Similar to the Navy FAP, CPS also typically provides prevention, intervention, and treatment support and services (directly or through referrals and contractual agreements) to children and families at risk of, or affected by, child maltreatment. Mandated reporters must report all suspected child maltreatment to both FAP and CPS (see Chapter 4: Reporting).



# **Chapter 2:** Prevention

Prevention, in terms of CAPER, occurs when environments, relationships, and processes support child well-being, safety, and security, thus minimizing the risk of child maltreatment in a CYP. Prevention focuses on protecting all children, families, and CDC Professionals by creating safe, healthy spaces for everyone through the implementation of, and strict adherence to, Navy CYP policies. It is imperative that the CDC Management Team not only effectively implements and monitors policies and procedures designed to ensure the safety and well-being of children in care, but also uses quality assurance mechanisms on a daily basis to ensure staff's adherence to, and understanding of, such policies. Failure to uphold operational measures or quality assurance mechanisms may not only lead to violations of CYP policies, but could lead to actions that constitute child maltreatment.

Consistent with OPNAVINST 1700.9, this chapter describes CYP policies designed to minimize the risk of harm and maximize CYP's protective capacity for all children in care. To maintain these safeguards, CDC Professionals must:

▸ Adhere to all requirements for accountability and supervision of children that aim to prevent child maltreatment, including adhering to defined staff:child ratios and LOSS policies;

▸ Engage in appropriate interactions and relationships with children in their care; and

▸ Use tools and strategies to recognize and address their own stress-related needs throughout the program day.

## 2.1  Accountability and Supervision

CDC Professionals must be accountable for, and supervise the whereabouts of, children at all times as a routine part of their professional duties. Following proper accountability and supervision policies and protocols help CDC Professionals maintain awareness and control over the CDC environment and prevent situations from becoming hazardous for children in care. The *CDC Accountability and Supervision Standards* (when published) describe the full requirements and best practices for ensuring continual accountability and supervision in all Navy CYPs. CDC Professionals must thoroughly review and comply with all Standards as required for ensuring that lapses in accountability and supervision do not escalate into CAPER-related violations or allegations of institutional abuse.

According to the National Center on Child Care Quality Improvement, supervision incidents are the most common types of licensing complaints reported by State agencies. Research also suggests that the occurrence of physical injury may be associated with lack of supervision. These incidents, in some cases, can lead to reports of child neglect against the staff and jeopardize the accreditation status of the CDC.

## 2.1.1  Accountability Mandate

CDC Professionals are accountable for knowing the whereabouts of children in their care at all times. Appropriate accountability and supervision measures minimize the risk of accidents, child maltreatment, exposure to liability, and other potential hazards and stresses by providing strategies to ensure that all children are kept safe. Each CDC Professional must take personal responsibility for children under CDC care through the routine use of systematic procedures and through implementation of a team-based approach to supervision. A team approach means that CDC Professionals work collaboratively with each other and with the Management Team during emergencies and other unusual circumstances to account for all children (not just those assigned to their classroom) and communicate with each other. Examples of the need for such collaboration include the following:

▶ A Teacher requests, and the Lead Teacher or CDC Director arranges for, additional classroom manpower to maintain quality supervision of other children while meeting the needs of a child displaying inappropriate behavior or a child with an injury (e.g., having the Lead Teacher assist with classroom supervision while the primary Teacher works one-on-one to help a child gain control of his/her feelings).

▶ During an emergency evacuation, a CDC Director notices that a child at the end of a class line-up runs back into the classroom and hides in the bathroom (due, in part, to the classroom Teachers' failure to follow proper evacuation procedures). The CDC Director assumes temporary responsibility for the child until he/she is able to return the child to be with the rest of his/her class and communicates the child's whereabouts to the Teacher. The CDC Director addresses the Teachers' procedural violation after the emergency situation is resolved.

## 2.1.2  Accountability Strategies

In addition to implementing program-wide accountability measures to control access to the facility, staff must also implement accountability strategies that ensure the children are appropriately supervised in the classroom, on the playground, throughout the facility, and on trips away from the facility. These strategies are essential to ensuring ongoing accountability and supervision of all children in care in the CDC program. Implementation of these and other key requirements are detailed in the *CDC Accountability and Supervision Standards* (when published).

This section describes several critical accountability strategies designed to ensure child safety and minimize lapses in supervision or circumstances that could place children at risk for harm.

### *Check-In/Check-Out Procedures*

Navy CYP policy requires check-in/check-out for both children attending CYP and for any visitors to CYP, including parents. Check-in/check-out procedures ensure child safety by documenting and monitoring child entry and exit to both the CDC itself and the classroom. Following child check-in/check-out procedures ensures and documents that each child is accounted for so that no child can be taken or wander away from the CDC. Furthermore, check-in/check-out procedures also ensure overall safety for both staff and children by documenting and monitoring all visitors to the CDC. All visitors must sign-in, be issued a visitor's pass, and be escorted while present in the building.

## Head Counts and Name-to-Face Recognition

Head counts, or counting and verifying the number of children in care, are conducted frequently throughout the day and should be an ingrained procedure for all CDC Professionals. Teachers are required to conduct head counts, at a minimum, before and after each transition in or out of the classroom–the times that they would be most likely to lose track of individual children if accountability practices were not conducted. CDC Professionals should verbalize the head counts so that all CDC Professionals are aware of the number of children in their care. Head counts ensure that all children are safe and accounted for throughout the day.

Name-to-face recognition is an accountability strategy that allows Teachers to verify the children in their care based on the Classroom Attendance Roster. This procedure is used as a cross-reference for head counts. Name-to-face recognition adds another layer of security as Teachers verbally and physically account for each child on the Classroom Attendance Roster. Name-to-face recognition checks are conducted during the hourly ratio checks and during transitions that occur when children are moved from one location to another (e.g., classroom to playground, playground to classroom, combining of groups, moving between classrooms, opening and closing a classroom, group walks and field trips). By conducting regular name-to-face recognition checks, Teachers are quickly alerted that a child is not with the group, and a search for the child can begin in a timely manner to lessen the likelihood of the child from being exposed to danger or remaining in an unattended space.

## Visual Sweeps

A visual sweep involves CDC Professionals scanning the environment to ensure that all children are present and in attendance. Visual sweeps must be done continuously throughout the day. CDC Professionals move about the space for which they are responsible to ensure they know the whereabouts of all children and that children are not positioned in an area where they may not easily be seen. Teachers must physically reposition themselves constantly throughout the day to ensure the visibility of all children—where they are and what they are doing—throughout the environment. As Teachers become familiar with the children in their care, this procedure becomes more natural and they also become more familiar with those children who require closer supervision.

## Two-Person Integrity Policies

Two-person integrity policies are an important prevention strategy for child maltreatment in a CDC program. Such policies mandate that CDC personnel are not permitted to be alone with a child and must be in the line of sight of another employee at all times. These policies not only ensure that children are safe and secure, but also that CDC Professionals have the support and back-up they need to supervise effectively and mitigate stress. In order to effectively prevent instances of suspected institutional abuse in a CDC program, it is imperative that CDC Professionals maintain two-person integrity at all times during the program day.

## Staff:Child Ratios and Group Size

Navy CDC staff:child ratios and maximum group sizes, which are influenced by the National Association for the Education of Young Children (NAEYC) Standards and Criteria, are key policy requirements that not only facilitate child supervision, but also aim to prevent child maltreatment in the CDC. Ratio and group size lay the foundation for ensuring that supervision strategies can be effectively implemented. In addition, Navy policy sets the maximum allowable number of children per CDC Professional and group size based on

children's ages. Staff:child ratios also ensure two-person integrity in the classroom, a measure that not only protects children, but also CDC Professionals. By always ensuring that two adults are present in a classroom or play area at all times, the policy ensures that CDC Professionals may provide support and back-up to one another throughout the day, thus supporting proper stress management strategies. Furthermore, the policy also ensures that there is always a CDC Professional present to intervene and report should an incident or accident occur. Implementation of staff:child ratios and group size are detailed further in the *CDC Accountability and Supervision Standards* (when published).

### Line of Sight Supervision

Navy Child and Youth Programs Line of Sight Supervision (LOSS) is a critical measure to ensure child safety and well-being in CDC programs at all times. As a condition of employment, all CYP Professionals must undergo a criminal background check. LOSS policy ensures that individuals awaiting background check results are never alone with any child in the CDC program and that they are under the constant supervision of another CDC employee. According to LOSS requirements, all CYP personnel, including contractors and provisional employees who are awaiting the results of a criminal background check, as well as all volunteers, must work within direct LOSS of an employee who has a completed criminal history background check with a favorable suitability determination AND has met the periodic reinvestigation requirement for recurring criminal history background checks. Furthermore, all CYP personnel whose background checks have not yet been completed must be visibly identified by wearing a red-toned smock or shirt so that CDC staff can easily and quickly monitor their activities.

## 2.1.3  Supervision for Safety

Conscientious supervision is integral to not only child safety and well-being, but also to the provision of high-quality program standards. Supervision of children not only protects them from harmful situations, it also protects children from each other, especially when challenging behavioral issues arise. Supervision and guidance of children are clearly intertwined in the research literature. Proper supervision can reduce the incidence of certain behavioral problems and can decrease injury rates among young children. Supervision varies according to a child's age, self-help skills, and activity. Teachers need to have a firm knowledge and understanding of child growth and development in order to implement developmentally appropriate supervision strategies. For more specific guidance on developmentally appropriate supervision strategies, consult the *CDC Accountability and Supervision Standards* (when published).

# 2.2  Interactions and Relationships

Positive interactions between staff and children foster healthy relationships that form the foundation for building supportive social interactions, facilitating children's learning, and nurturing their development through the use of positive guidance. Ensuring that interactions and relationships with children are appropriate and nurturing is also integral to the prevention of child maltreatment. The *CDC Interactions and Relationships Standards* describe the full range of requirements and best practices for ensuring positive interactions and building nurturing relationships between CDC Professionals and children in all Navy CDCs. This section highlights the key aspects relevant to CAPER, including those behaviors and situations that "cross the line" into questionable conduct, violation of policy, and potential child maltreatment.

**The Navy requires a positive approach to guidance.** All CDC Professionals must be knowledgeable about and use positive, developmentally appropriate guidance and touch with all children. This ensures that

children are safe and protected, provides a positive climate that promotes healthy social and emotional development, and teaches and models appropriate behavior. All CDC Professionals must follow the *Navy CYP Guidance and Touch Policy*, which delineates the boundaries for appropriate and inappropriate touch to ensure a safe, healthy, and positive environment for children and youth.

The use of inappropriate guidance techniques can cause harm to children and may lead to allegations of child maltreatment against a CDC Professional. **Corporal punishment or other negative discipline methods that hurt, humiliate, or frighten children and inappropriate touch are prohibited.**

## 2.2.1  Inappropriate Interactions

The following types of interactions are considered inappropriate and are **prohibited** at all times. CDC Professionals who engage in any of these, or similar, actions may be subject to disciplinary action up to, and including, termination.

▸ Corporal punishment or any humiliating, frightening, or threatening language or punishment. Corporal punishment includes spanking, hitting, punching, slapping, pinching, shaking (this is life-threatening behavior toward infants), exposure to extreme temperatures or other measures producing physical pain, and any form of physical punishment. Corporal punishment is forbidden in any CYP setting by any individual, including the child's parents.

> **NAEYC Accreditation**
>
> Required Criterion 1.B.09: "Teaching staff never use physical punishment such as shaking or hitting and do not engage in psychological abuse or coercion."

▸ Psychological punishment or any demeaning statement such as verbal abuse, threats, abusive or profane language, criticism, or derogatory remarks about a child or family. Examples include: "You are the worst kid in this class;" "You are going to get it if you don't cut that out right now;" or "Why can't you follow directions like the other children for once?" These types of statements or questions are not allowed at any time.

▸ Physical restraint; binding; restricting the child's movements or placing the child in a confined space as a form of punishment; or forcing the child to stay in a restricted space, corner, bathroom, or any area of the room where he/she is separated from the rest of the group.

▸ Any form of emotional abuse, including any form of public or private humiliation, or threats of physical punishment.

▸ Rejecting, terrorizing, ignoring, isolating, or corrupting and/or exploiting a child.

▸ Withholding or forcing naps, meals, or snacks, including denying a child a second serving of food until he/she has finished everything on his/her plate.

▸ Punishing for toileting accidents or a lapse in toilet training.

▸ Withholding outdoor play as a form of punishment.

▸ Bodily harm from forceful pulling/jerking and/or "grabbing" a child from any position (**Note:** There may be emergency circumstances where a Teacher may need to physically respond because there is observable action that puts the child or others at risk for immediate harm and it is probable that the action will lead to actual injury. For example, if a child unexpectedly dashes into a parking lot, the Teacher should quickly remove the child for his/her own safety.)

## 2.2.2   Inappropriate Touch and the Navy CYP Guidance and Touch Policy

The *Navy CYP Guidance and Touch Policy* provides direction to CDC Professionals on how to facilitate child interactions in a caring and appropriate manner. Appropriate touch is an essential part of providing care for young children and must be used in a positive, affectionate, and appropriate manner. However, what is appropriate for young children may not be appropriate for youth. The Training Specialist is responsible for providing CDC Professionals with mandatory training to define the types of touch that are appropriate while caring for children.

Each CDC Professional working with children must receive and understand the *Navy CYP Guidance and Touch Policy* as reinforcement of expectations and requirements. Guidelines for physical contact or touch are age-specific and must be strictly followed. The *CDC Interactions and Relationships Standards* include the *Navy CYP Guidance and Touch Policy*, which must be reviewed with every new CDC Professional at orientation and posted in each facility to educate families on these important Navy policies.

**Appropriate touch** is physical contact that respects the personal privacy and space of others. It is defined as touching that is gentle and positive, natural and appropriate within the context of normal, acceptable adult and child interactions for the child's age. The *Navy CYP Guidance and Touch Policy* considers appropriate touch to be acceptable.

**Inappropriate touch** is physical contact that does not respect the child's personal space and is negative in context. Inappropriate touch is not natural or appropriate, and can be harmful to children. It can involve force, harm, coercion, or other forms of exploitation of a child. Inappropriate touch is also any touch that is inappropriate for the child's age. Children should never feel uncomfortable because of a touch from a staff member. Inappropriate touch is **prohibited** by the Navy.

Throughout their work day, Teachers are constantly assisting children, often touching them in some way. As such, Teachers must understand that physically touching children is **an essential part of their job**. Yet, Teachers must know the difference between appropriate and inappropriate touch, and respect a child's right to not be touched in ways that make them feel uncomfortable. Exhibit 2.2.2A provides examples of appropriate and inappropriate touch for each age category.

### Exhibit 2.2.2A: Types of Touch by Age

| Age Category | Appropriate Touch | Inappropriate Touch |
|---|---|---|
| **Infant, Pretoddler, and Toddler** | ‣ Cuddling<br>‣ Holding<br>‣ Rocking<br>‣ Gently patting or rubbing a child's back for a short period at rest time<br>‣ Sitting in the CYP Professional's lap<br>‣ Hugging<br>‣ Hand holding<br>‣ Kissing on the cheek, forehead, hand, or hair<br>‣ Stroking the hair to assist in resting | ‣ Pinching, hitting or punching, squeezing, slapping, shaking, arm twisting, or grabbing*<br>‣ Physically restraining a child<br>‣ Any form of physical punishment<br>‣ Violating laws against adult/child physical or sexual contact<br>‣ Forcing of hugs, kisses, or other touches on the child<br>‣ Kissing a child on the lips<br>‣ Tickling<br>‣ Holding a child down on his/her cot to force napping |

| Age Category | Appropriate Touch | Inappropriate Touch |
|---|---|---|
| | ▸ Changing diapers and assisting with toileting (i.e., wiping child, putting on diaper rash cream, etc.) | |
| Preschool | ▸ Hand holding<br>▸ Assisting child with activities<br>▸ Child initiated hugs<br>▸ Assisting with toileting accidents if necessary<br>▸ Assisting a child with unsafe behavior to calm down by physically responding to protect everyone's health and safety**<br>▸ Sitting on CYP Professional's lap at the request of the child (i.e., verbal or nonverbal) | ▸ Forced goodbyes<br>▸ Tickling<br>▸ Pinching, hitting, punching, squeezing, slapping, shaking, arm twisting, or grabbing*<br>▸ Restricting a child's movement by any means in any way<br>▸ Physically restraining a child<br>▸ Any form of physical punishment<br>▸ Violating laws against adult/child physical or sexual contact<br>▸ Forcing of hugs, kisses, or other touches on the child<br>▸ Kissing a child on the lips<br>▸ Holding a child down on his/her cot to force napping |

*Grabbing is inappropriate unless it protects the child from immediate danger, protecting his/her safety.

**A physical response may be needed for a child with unsafe behavior because there is observable action that puts the child or others at risk for immediate harm and it is probable that the action will lead to actual injury.

Strict adherence to the CDC Interactions and Relationships Standards not only promotes program quality and protects the well-being of the children in care, but also protects the CDC Professional from allegations of child maltreatment and the CDC against potential liability issues.

# 2.3  Workplace Stress (Prevention and Early Intervention)

Caring for children is rewarding; however, it is also a tremendous responsibility that can be stressful, given the demands of the profession. Because of the interactive nature of the work, CDC Professionals can sometimes internalize the stress of children and family members and become overwhelmed. They also have circumstances in their own personal lives that can affect their work. Identifying the signs of negative stress and bolstering stress management strategies before unmanaged stress turns into frustration and anger are important elements of child maltreatment prevention.

## 2.3.1  Signs of Workplace Stress

Recognizing the signs of caregiver stress or burnout is an important aspect of child abuse prevention. Stress, when ignored or left unmanaged, can lead to behaviors that may put a child at risk. Training Specialists must educate CDC Professionals on how to identify signs of high stress and burnout, as well as offer ways to improve or manage Teachers' personal stress levels. Possible behavioral changes which signal that a Teacher may be experiencing stress or burnout include:

▸ Expressing discontent with aspects of his/her life (e.g., work, family life, social activities);

▸ Becoming easily irritated by small problems or issues or normal child behaviors;

▸ Experiencing sudden mood swings;

▸ Experiencing fatigue or feeling worn-out (e.g., physically or emotionally);

▸ Lacking motivation to complete activities or tasks;

▸ Experiencing changes in normal interactions with children;

▸ Using a sharp tone in interactions with children or adults; and

▸ Responding or reacting in a hyper-quick manner when the situation does not appear to warrant it (e.g., overreacting).

The CDC Management Team must emphasize to all CDC Professionals the importance of reaching out for support when they feel stressed or need help. CDC Professionals need to know that support systems are in place, be assured that asking for help is not a sign of failure or weakness, and know how to access help when they need it. There should never be shame or punishment associated with a CDC Professional asking for assistance. The CDC Management Team is responsible for creating a culture in which CDC Professionals realize that in order to care for children, they must also take care of themselves.

If any CDC staff member has concerns about a CDC Professional's behavior, he/she must consult immediately with the CDC Management Team.

## 2.3.2   Strategies for Preventing Stress-Related Interactions

In order to effectively prevent stress-related interactions, programs must develop an internal alert system by instituting a code word or phrase to signal to other CDC Professionals that a staff member needs immediate support or assistance. This internal, organizational practice creates a safe and professional way to diffuse a staff member's stress reaction and provide support while enabling the program to continue to provide a caring, nurturing environment.

When setting up an internal alert system that uses a code word or signal to alert the Management or Training Team that a Teacher needs assistance, programs should ensure that the code word or signal has a positive or neutral connotation, supports professionalism, and can be communicated discretely to minimize any disruption to the classroom. For example: To verbally express a need for support, a CDC Program could use a color code system (e.g., Code Blue: Teachers needs immediate support or assistance) or a numbering system (e.g., Code 1: Teachers needs immediate support or assistance).

Once the method and process for the internal alert system is determined, it should be clearly communicated to all CDC staff so they understand both the purpose of the alert system and how to use it appropriately. Direct care staff should be trained to use this code system when they observe that a colleague is demonstrating active signs of stress while interacting with children (e.g., getting visibly upset, frustrated or angry, overreacting to small issues, acting overwhelmed, etc.,). When the internal alert system is used, CDC staff may expect that the Management or Training Team will respond immediately and professionally to ensure that appropriate intervention and support is provided to the staff member in need and that disruption to the classroom in minimized.

When an internal alert system is used, it is essential that the Management and/or Training Team use key follow-up strategies to: (1) effectively monitor and address the staff member's on-going stress levels and support needs; and (2) mitigate the occurrence of future stress induced interactions that may negatively impact the quality of care in the classroom.

▶ **Regular Check-In's**: Offering support to a CDC Professional who is experiencing acute stress or in need of assistance should not simply start and stop with a CDC Professional's departure and re-entrance to the classroom following the use of an internal alert. The Management or Training Team must work with the CDC Professional to discuss the sources of the stress and identify effective coping strategies and resources to manage and address that stress moving forward. For example, following the use of an internal alert, a CDC Professional is given a 15-minute break to calm down and compose his/herself. Before the CDC Professional re-enters the classroom and resumes his/her duties, the Management Team should check-in with the CDC Professional to discuss what transpired and identify both the cause of the stress and what supports may be helpful to manage a recurrence of the stress reaction in the future. The Management Team should schedule regular check-ins throughout the rest of the workday and over the next few weeks to ensure the CDC Professional is effectively using strategies to manage stress and to identify additional supports or resources, if needed.

▶ **Group De-Brief**: A "group de-brief" is a holistic follow-up strategy that provides an opportunity for all members of the classroom to discuss the incident and observed stressors, identify supports that may help the team manage stress moving forward and offer support to one another following the use of an internal alert. Group de-briefs may be held at the end of that workday or during lunchtime (as staffing schedules permit).

▶ **Continued Review and Evaluation of the Internal Alert System**: The CDC Director and Training and Curriculum Specialist should continually evaluate the use of the internal alert system to determine if the system is being used optimally, if it is effective as a preventative measure, and if additional support plans need to be developed to address other types of classroom circumstances that may require immediate intervention as these may not be isolated incidents (i.e., injury of child or staff, behavior challenges, classroom management).

In addition to the use of an internal alert system, the Management and Training Team should also use preventative strategies to mitigate the occurrence of future stress-related interactions in the classroom. For instance, since time management is often identified as a source of stress, the Training Specialists can help CDC Professionals learn how to balance their time and work responsibilities more effectively by integrating information about time management strategies into their training and classroom observations. Some additional strategies for preventing or diffusing potential stressors are included below:

▶ Provide training and other resources as necessary (e.g., time management training, stress management strategies, mental health and wellness brochures).

▶ Encourage CDC Professionals by modeling expectations and being honest during conversations.

▶ Host trainings and events that honor CDC Professionals' skills and areas of expertise, and provide opportunities for networking with others.

▶ Encourage fun activities to build rapport and cohesion among the staff, such as holding potluck meals when having staff meetings, planning fun contests for staff, and hosting team-building activities.

Similarly, Teachers need to ensure that they, themselves, can successfully maintain a healthy work–life balance and take time for self-care and their families. Teachers who never say "no" and who try to do too

much may find themselves overstressed and burned out in a very short period of time, which may increase the risk of inappropriate interactions with the children in care. See Appendix A: Additional Resources for a handout with tips regarding self-care and stress management.

### 2.3.3    Colleague Support and Examples of Effective Intervention

CDC Professionals should be sources of support and empathy for one another while encouraging positivity in daily interactions and relationships with children. As part of a holistic prevention strategy, all CDC Professionals share responsibility for engaging in and promoting self-care and actively observing colleagues on a daily basis with two primary goals: (1) to prevent individual stressors from negatively affecting child care quality through mutual support and teaming, and (2) to continuously learn and improve by incorporating other CDC Professionals' best practices into one's own practices. Consider the following example:

▶ A frustrated toddler is yelling, "No, mine!" instead of putting his toy away at clean-up time. Teacher A tells the toddler to put his toy away if he wants to have a snack, and then turns to help another child pick up blocks as the toddler yells, "No, mine!," again and throws the block at Teacher A. Teacher A starts to feel frustrated and waves to Teacher B for assistance. Teacher B comes over, crouches in front of the toddler, and calmly and softly asks the toddler to identify the toy, which the toddler does. Teacher B then asks the toddler what color it is and the toddler responds. Teacher B then says, "It's clean-up time. Would *you* like to put the yellow block in the blocks bin or do you want *me* to put it in?" The toddler says, "I do it!," and puts it in the bin. Teacher B gives the toddler brief praise for a good clean-up. At the end of the day, Teacher B speaks with Teacher A about strategies to deescalate this kind of incident in the future. The next day, Teacher A uses eye contact, an identification question, and a win–win choice to successfully avoid a verbal power struggle with a different toddler.

**Note:** The safety and well-being of children in care is always paramount. If a CDC Professional has concerns about a colleague that cannot be properly addressed through mentoring and colleague support, it is essential that the CDC Professional communicate concerns to their direct supervisor. CDC Professionals must be conscientious and take their caregiving role seriously. The children in care depend on their good judgment and diligence when it comes to matters of health and safety.



# Chapter 3: Education

CAPER education refers to the process of equipping all CDC Professionals with the knowledge, skills, and abilities to fulfill their roles and responsibilities, including opportunities for practical application that lead to sustained learning.

The intent of CAPER education is twofold:

▸ *CDC Professional Preparation* prepares CDC Professionals to (1) better understand child maltreatment risks and protective factors; (2) recognize their legal roles and limits in preventing child maltreatment (including accountability for and supervision of children, appropriate interactions and relationships, and physical facility policies); (3) identify child maltreatment; (4) report concerns promptly and appropriately; and (5) be familiar with other resources and supportive services available to families.

▸ *Family Education* offers families some opportunities to better understand child development, child maltreatment risks and protective factors, Navy and local community resources and supportive services, and CYPs' roles and responsibilities in preventing and reporting child maltreatment.

> Protective factors are conditions or attributes of individuals, families, communities, or the larger society that reduce or eliminate risk and promote healthy development and well-being of children and families. These factors help ensure that children and youth function well at home, in school, at work, and in the community.
>
> - *U.S. Department of Health and Human Services, Administration of Children, Youth and Families: Making Meaningful Connections: 2015 Prevention Resource Guide*

The CDC Training Team is responsible for delivering CAPER education during new staff orientation and annual refresher training to CDC Professionals. The Training Specialist is also responsible for developing and delivering workshops, informational materials, and other resources to families around strategies for dealing with stress and minimizing the risks associated with child maltreatment. The CDC Director shall also establish and maintain an up-to-date resource library at the CDC with CAPER resources for families and CDC Professionals. Appendix A: Additional Resources includes websites and organizations with CAPER resources.

CYPs shall coordinate with each other and installation partners (e.g., FFSC; Morale, Welfare, and Recreation; base chaplains) to highlight prevention and education. The month of April is a perfect time for annual CAPER training, retraining, and events because it is also designated as National Child Abuse Prevention Month and the Month of the Military Child. NAEYC's Week of the Young Child also occurs in April.

## 3.1 CAPER Training for CDC Professionals

The CDC Training Team must provide CAPER training to CDC Professionals. Each CDC Professional is responsible for actively participating in the required training, learning the material, and applying the knowledge gained in day-to-day practice.

### 3.1.1 Formal CAPER Training

Formal CAPER training is designed for delivery to CDC Professionals during orientation and annually thereafter, and it meets DoD and Navy requirements. Formal CAPER Training includes:

- **DoD Child Abuse Modules:** All CDC Professionals are required to complete Module A: *Identifying, Recognizing and* Reporting and Module B: *Preventing and Responding to Child Abuse in Center Settings* within 60 days of hire.

- **CAPER Orientation Training:** All CDC Professionals are required to complete this training; no CDC Professional may begin working in a CDC until he/she has completed this training. This fundamental training covers each of the core CAPER competencies.

- **CAPER Annual Training:** All CDC Professionals working with children must complete CAPER training annually. This training combines a refresher on the core competencies with customized CAPER topics based on identified program needs and as agreed upon by the local FAP and CDC Management Team.

All CDCs must use the CAPER Orientation Training and CAPER Annual Training, which are described below; CDCs may not use any other form of training to meet the core orientation and annual training requirements. All CDC Professionals receive additional supplemental resources throughout the year to augment and enhance the training experience. All CAPER training is competency based, meaning that upon completion, all training participants must demonstrate a solid understanding of the core CAPER competencies. Specifically, CDC Professionals must learn and maintain knowledge, skills, and abilities related to the following core CAPER competencies at a minimum:

- Defining child abuse, child neglect, and institutional abuse;
- Differentiating risk factors from safety issues;
- Recognizing strong parent partnerships as prevention;
- Identifying indicators of workplace stress and trauma;
- Listing Navy and local community resources and contact information;
- Describing reporting requirements and procedures; and
- Practicing appropriate CAPER confidentiality protocols.

### 3.1.2 Ongoing Support and Retraining

The CDC Training Team must ensure—not only through formal training, but also through supervision, ongoing guidance, and supplemental ad hoc training (e.g., classroom observations, constructive feedback and coaching, guest speakers at staff meetings, targeted discussions, handouts)—that CDC Professionals

maintain and apply CAPER knowledge, skills, and abilities. The Training Team should encourage CDC Professionals to self-identify strengths, areas for improvement, and professional development goals. The CDC Director must incorporate CDC Professionals' self-assessments into ongoing guidance and performance reviews, and should also identify opportunities for CDC Professionals to support their professional development (e.g., webinars, participation in a stakeholder group). If a CDC Professional's on-the-job actions indicate that he/she needs CAPER retraining, the CDC Management Team reserves the right to identify and require appropriate CAPER retraining.

### 3.1.3  CAPER Training for Families

#### *Annual Training and Education*

CYPs must offer to families, at a minimum, annual training or education related to child maltreatment prevention, identification, and reporting. This requirement can be fulfilled in a variety of ways, including:

- Disseminating tip sheets or fact sheets on children's developmental ages and stages;
- Distributing a list of Navy and community support resources, including the DoD Child Abuse and Safety Hotline and local FAP contact information;
- Inviting parents and caregivers to attend CDC Professionals' annual CAPER training;
- Providing annual workshops, based on CAPER Training and in collaboration with FAP; and
- Providing notice (e.g., through signs posted in the reception area, monthly newsletters, social media blasts, resource tables at Parent Information Board meetings) of webinars, FAP classes, or local training opportunities that the CDC Director or FAP identifies as topically relevant.

#### *DoD Child Abuse and Safety Hotline Poster*



The DoD Child Abuse and Safety Hotline Poster provides important child maltreatment reporting information to parents and caregivers. The poster must be posted in a prominent location in the CDC front lobby as well as Parent Information Boards to provide parents with the resources they need to report suspected child abuse or neglect. The poster is pre-printed with the DoD Child Abuse and Safety hotline number. The CDC Director must add the contact number for both the local FAR and the State or local CPS to the poster, when applicable. The DoD Hotline number is intended primarily for parents or the general public. CDC Professionals should always first follow mandated reporter protocols, delineated in Chapter 4: Reporting when reporting child abuse or neglect. If, for some reason, the CDC Professional cannot reach the designated contact to report suspected child maltreatment, he/she may contact this hotline for assistance.

The DoD Child Abuse and Safety Hotline information is also included in the Navy's standardized Parent Handbook. The CDC Director shall ensure that all parents receive a copy of the Parent Handbook and are informed during orientation about the information contained in the handbook. All CDC Professionals should have knowledge of the DoD Hotline number and be prepared to provide information about its purpose to parents if needed.

## Ongoing Teacher–Parent Communication

On a daily basis, CDC Teachers have both opportunities and an obligation to communicate with children's parents about their child. Daily communication and interactions at drop-off and pick-up times promote strong teacher–parent partnerships, educate teachers about the child's family life, and strengthen parents' knowledge of developmentally appropriate behaviors and milestones for their child. These exchanges may also suggest areas of need for family support and additional education, which are critical to mitigating the risks associated with child maltreatment.

## Resource Development and Distribution

Programs must also provide and publicize ongoing, current CAPER information materials and training opportunities to families. The CDC Management Team should support recruitment and parent participation in the Parent Information Board as a source of continued education and communication about CAPER-related matters, information, and training. Additionally, the CDC Director should ensure that the CYP Library provides up-to-date CAPER resources (e.g., books, pamphlets) that families (and CDC Professionals) may check out or review. CDC Directors must identify strategies for marketing the library and distributing CAPER information so that families are aware of relevant resources and events. Marketing opportunities include sending home fliers, sponsoring special events, hosting resource tables during Parent Information Board meetings, placing articles in program newsletters, and posting social media blasts.

The CDC Director has primary responsibility for identifying resources and making them accessible to families to meet these requirements. The Training Specialist is a resource to assist the CDC Director with workshop, training, and resource development and delivery. Teachers assist with the distribution of information to families as requested by the CDC Director.



# Chapter 4: Reporting

As discussed in Chapter 1: Introduction, CDC Professionals are **mandated reporters** and have a legal and professional responsibility to report any suspicions of child maltreatment, regardless of the context for the abuse and/or who the alleged perpetrator may be. That duty cannot be delegated to another individual under any circumstances. This chapter delineates all steps and considerations in the reporting process. Furthermore, this chapter details the additional reporting responsibilities assumed by the CDC Director, including those required by NAEYC and CNIC notification.

CDC Directors are responsible for completing and disseminating a *Local CAPER Contact Information Supplement—CNICCYP 1700/56*, which contains all current contact information for all relevant Navy personnel and State agencies involved in the reporting and investigation of child maltreatment as well as entities who provide family and child support services.

The mandated reporting process is simple. Exhibit 4.0A below presents the mandated reporter process for CDC programs in the contiguous United States.

### Exhibit 4.0A: Mandated Reporter Process



# 4.1 Mandated Reporter Process

Many factors must be considered when assessing concerns for a child's safety and well-being, including the child's age, developmental stage, and environment. These factors can help determine whether a child has been harmed or is at risk of harm. Following CAPER training, CDC Professionals should have the understanding and tools needed to make an informed determination regarding the reporting of suspected child maltreatment. The CDC Professional's suspicions can be based on any one or a combination of sources, including indicators for child maltreatment (detailed in Section 1.2) discovered through personal observation and/or second-hand reports. The CDC Professional does not make the ultimate decision about whether a child has been maltreated, but is simply responsible for alerting the proper authorities about any suspected instances of child maltreatment so that the child's situation can be properly investigated.

## 4.1.1 Reporting Steps: CONUS

The following steps are required for reporting child maltreatment in the contiguous United States (CONUS).

1. **Confirm that the situation meets the threshold for reportable child maltreatment.**

To determine this, consider the definitions of and indicators for all types of child maltreatment provided in Section 1.2 and answer the following questions:

> ‣ Does the situation meet the definition(s) of child maltreatment?
>
> ‣ Do the identified indicators of child maltreatment surpass what might be explained by accidental/unintentional injury and/or normal child development?
>
> ‣ Does the situation constitute an immediate risk of harm to the child or pose a risk for future harm to the child?

If the CDC Professional is unsure about any of these considerations, he/she should talk through the situation with the CDC Director or the FAR; both of these resources can provide critical guidance and help to clarify any questions. CDC Professionals are **encouraged** but are not required to notify the CDC Director of any incidents of suspected child maltreatment. Informing the CDC Director directly about any reported institutional abuse would allow the Director to take immediate and appropriate actions to protect all children in the CDC program without delay.

2. **If yes, report to FAR *and* CPS *within 24 hours* of a suspected incident.**

The CDC Professional must first contact and make a formal report to the **FAR**, who will then provide guidance on next steps, if necessary, such as contacting the Naval Criminal Investigative Service, base security, or local law enforcement.

If the report is an allegation of institutional abuse, the FAR will formally notify the CDC Director.

After contacting the FAR, the CDC Professional shall then immediately contact **CPS**. When making a formal report to CPS, the CDC Professional may have to provide the following information to help the designated agencies take further action:

- Child's name and age;

- Home address or address where the child can be reached;

- Parents' or legal guardians' names, phone numbers, and addresses, if known;

- Alleged perpetrator, if known;

- Specific physical and behavioral observations that indicate child maltreatment; and

- Opinion of whether the child is in imminent danger.

The child's safety is paramount in all situations. If some of this information is not immediately accessible and the child is in immediate danger, the CDC Professional may provide information from records (e.g., parents' phone numbers) at a later time. CPS will work with the program to secure the child's immediate safety, as needed, and gather and provide complete information to the authorities.

**Note:** If the CDC Professional is unable to reach the FAR first, then the CDC Professional should continue the process by contacting CPS with the report. CPS will then provide any additional guidance on contacting local law enforcement, if necessary. The CDC Professional shall then continue to try and contact the FAR as the mandated reporter.

> *If the situation does not meet the threshold for reportable child maltreatment*, share your concerns with the CDC Director. Because the safety and well-being of children in care are paramount, it is important to share any concerns with the CDC Director so that he/she may determine whether the concern constitutes a CYP policy violation (see Chapter 6: CYP Policy Violations); put a plan in place to assist the CYP Professional in question (via training, mentoring, or other referrals); and remedy the situation before it becomes more serious.

Once the CDC Professional has reported suspected child maltreatment, he/she must leave further assessment or investigation of the situation to the proper authorities. The reporter's role is not to determine the outcome; his/her sole responsibility is to accurately report the incident, suspicions, or observations. The FAR and CPS, through their independent assessment and investigation respectively, provide information and determination regarding the maltreatment case referred. Although it is not required by law, it is **recommended** that the CDC Professional discuss the matter with the CDC Director so that the Director is apprised of events in the CDC and can be prepared to take appropriate action, if required.

## 4.1.2   Reporting Steps: OCONUS

For CDC programs outside of the continental United States (OCONUS), the reporting requirements are nearly identical except that OCONUS locations generally do not have access to a local CPS and thus, must work directly with the FAR to ensure complete reporting. In OCONUS locations, the report must comply with applicable treaties/Status of Forces Agreements (SOFAs) and instruction procedures established by the CYP Installation Director and the FAR. The local FAR is responsible for complying with applicable international laws and ensuring that proper protocols are followed.

### 4.1.3  Mandated Reporter Scenario

Below is a two-part example that is designed to help CDC Professionals apply the child maltreatment indicators presented in Chapter 1: Introduction and mandated reporter protocols presented earlier in this chapter.

**Part 1:** For the last few months, Jonathan has been hitting his classmates and teachers, and destroying classroom belongings in his prekindergarten room. This is not typical behavior for Jonathan. His primary teacher, Teacher Z, speaks with Jonathan's mother about his behavior. His mother states, "It's been difficult keeping Jonathan under control since his father deployed 3 months ago."

▸ These facts alone **do not** suggest child maltreatment (see Chapter 1: Introduction). However, given that the CDC Professional knows there has been a change in the family dynamic and the behavior has been ongoing for 3 months, the CDC Professional may reasonably believe that the family may benefit from formal supports or services. The CDC Professional should consult with the CDC Director to identify the family's potential need for assistance and make referrals to appropriate services (such as the MFLC program or the NPSHVP program).

**Part 2:** Later that week, while Jonathan is in the bathroom, Teacher Z observes multiple bruises covering his lower body, starting on his lower back and ending at his legs. The marks are very deep, and black and blue. He has one very large thick mark on his lower back that is diagonal, just above his buttocks. Teacher Z asks Jonathan what happened. He states, "Uncle David whipped me because I was hitting my friends." He adds, "I'm using my listening ears."

▸ The indicators described in this scenario meet the criteria for suspected physical abuse (see Chapter 1: Introduction). The CDC Professional can deduce that Uncle David was acting in a caretaking role because he was punishing Jonathan for his behavior. The CDC Professional must report this situation to FAR and CPS per mandated reporter protocols (see the previous section).The CDC Professional is encouraged to also notify the CDC Director of the situation.

### 4.1.4  Reporting Considerations

#### *Good Faith Reporting*

If a mandated reporter makes a report in good faith with earnest concern for the welfare of a child, he/she is immune from any criminal or civil liability that might result. CDC Professionals who report suspected child maltreatment are also immune from disciplinary action on the basis of the report alone, unless the report is knowingly false or the professional has been negligent in their role as a mandated reporter (e.g., failure to report within 24 hours).

> FAR and the CDC Management Team are knowledgeable resources to help the CYP Professional determine whether a reasonable concern for a child's safety or well-being exists, and to help connect families to appropriate services and supports.

CDC Professionals must apply what they learn in CAPER training and the information detailed in these Standards to consider all known facts and observations when making the decision to report incidents of child maltreatment. Not all situations will be clear cut, particularly in cases of suspected child neglect that cause less visible harm. However, consulting with available resources, such as the FAR and the CDC Management Team, can help clarify questions and recognize whether one's own values or beliefs may be

coloring one's view of the situation. These types of initial consultations will ultimately help the CDC Professional make a reasonable and confident decision to report in good faith.

When there is a report of child maltreatment, the FAR and CPS conduct independent assessments of the facts and family's circumstances to determine how to proceed in the referral. Not all reports result in a finding of substantiated child maltreatment. There will be cases in which a CDC Professional reasonably suspects child maltreatment, properly reports the concerns, and either the FAR or CPS determines that the information is insufficient to move the case forward or the ensuing investigation of the case determines that the allegations cannot be substantiated. This should not deter mandated reporters from fulfilling their obligation to report. As mandated reporters, CDC Professionals must report in good faith any suspicions of child maltreatment. Failure to report, as detailed in the next section, can have severe repercussions.

Here are two examples that illustrate instances in which a CDC Professional properly reported suspected child maltreatment in good faith based on direct observation or observed indicators of maltreatment, yet the FAR or CPS found that existing evidence and program/familial circumstances did not meet the criteria for child maltreatment.

▸ On Friday, when Jason's mother drops him off at the CDC , his teacher, Ms. Lindsey, noticed that he is walking funny and realized that he had a very full diaper. When she changed Jason, she noticed that he has a very bad diaper rash. Ms. Lindsey talked with Jason's father about the rash at pick-up and she felt as if the father brushed off the issue because he said, "OK," and quickly left with Jason. Ms. Lindsey informed the CDC Director of her concerns for Jason. On Monday, Jason had a rash on his bottom spreading to his upper thighs and red in color. The teacher asked his mother about the rash. She said that Jason has been scratching his leg and she doesn't know why but maybe he got a bug bite.

  - The observations made by Ms. Lindsey meet the indicators of suspected neglect (unchanged diapers, diaper rash, and a rash going down his thighs the following Monday) (see Chapter 1: Introduction). Per the mandated reporting steps delineated above, the teacher reported both incidents to the FAR and CPS. She also informed the CDC Director of the report. FAP arranged an appointment with the medical clinics' pediatrics department that day. CPS was also present at the doctor's appointment. The child was diagnosed with eczema and the parents were educated on how to treat a diaper rash and eczema. After an assessment and investigation, FAP and CPS found that these were two isolated incidents and that neither was due to abuse or neglect.

▸ Two Teachers transition their classroom of 3-year-olds to the playground from the classroom. They conduct a head count before they leave the classroom and then bring the children outside to play. Two minutes later, a parent walking by the classroom sees Henry inside and brings him to the front desk. The Operations Clerk notifies the CDC Director, who comes to the front desk. Henry is crying and says, "Everybody left me." The CDC Director walks Henry to the playground. One Teacher admits that she hadn't done her outside head count once they went outside, and thus didn't realize that Henry was missing. Last week, the CDC Director had been observing this class and gave both Teachers a warning after she observed an incident in which they failed to conduct proper head counts during a transition.

  - The CDC Director immediately makes arrangements for class coverage and removes both Teachers from duty. Because the Director recognizes a clear lapse in supervision that potentially placed a child at risk for harm (indicators of suspected immediate neglect) (see Chapter 1: Introduction), the CDC Director follows mandated reporter protocol and contacts the FAR and CPS to make a report. Additionally, the CDC Director submits an *Incident/Accident Reporting Form—CNICCYP 1700/25* within 24 hours of the incident and a NAEYC 72 Hour Notification Form (See Section 4.2 for more

information). The appropriate agencies take the report and assess the circumstances, but find that the circumstances did not meet the threshold for institutional abuse. The incident did, however, clearly violate Navy CYP supervision policy. As such, the CDC Director must then take immediate and appropriate corrective and personnel action with the two Teachers to address CYP policy violations (see Chapter 6: CYP Policy Violations).

Each example above presents clear indicators that child maltreatment may have occurred and the CDC Professionals appropriately made good faith reports. While CPS did not substantiate the case and FAP found that it did not meet the criteria for abuse or neglect, the CDC Professionals practiced due diligence in fulfilling their responsibilities as mandated reporters.

## Failure to Report

Failure to report is a serious violation of the law. Nearly every State has a statute specifying penalties for knowingly and willfully failing to report child abuse or neglect. Most States classify a failure to report as a criminal misdemeanor. Violators can face jail time, monetary fines, or both.

Making the decision to report may be difficult or feel like a violation of a family's or colleague's trust, but failure to report may deny a family much needed support, services, or treatment, and deny a child critical protection. CDC Professionals have the legal obligation to protect the child at all times.

A CDC Professional who fails to follow the laws, policies, and guidelines for reporting may also face CYP disciplinary action. When in doubt, the CDC Professional must seek guidance from available resources, such as the FAR and the CDC Management Team.

## False Reporting

There are penalties for knowingly and maliciously making false reports of child maltreatment. Many States also classify false reporting as a criminal misdemeanor. As with a failure to report, knowingly and willfully making a false report will result in disciplinary action as well as possible jail time and/or fines. Good faith immunity is not available where the liability results from willful misconduct or gross negligence by the reporter. False reports should not be confused with good faith reports that do not meet criteria for abuse in FAP or are unsubstantiated by CPS. Those cases are ruled out due to insufficient evidence as opposed to false reports in which the reporter knowingly gives incorrect, misleading, or exaggerated information to child protection agencies.

For example: Teacher A does not like Teacher B; she believes that Teacher B is too strict. She has never observed Teacher B violate any policies (including touch policies). One day, Teacher A overhears Teacher B jokingly tell the front desk receptionist, "Billy is a handful; sometimes I'd just like to give him a swat on the behind!" Teacher A smirks, calls FAR, and reports that Teacher B "is really strict, and she's swatting Billy and other children on the behind when they don't behave." Teacher A also tells FAR, "I'm really worried. I think she is losing control." In this example, Teacher A made a false statement of the facts and has no reasonable cause to believe that Teacher B is using any physical discipline or losing control. Teacher A is subject to CYP disciplinary action and may also be sentenced in a State court to pay a fine, serve jail time, or both for her false report.

### 4.1.5  Confidentiality in Reporting

#### *Reporter Confidentiality*

The FAP and CPS cannot guarantee keeping a reporter's identity confidential. This must not deter CDC Professionals from fulfilling their mandated reporter responsibilities.

#### *Report and Incident Confidentiality*

When reporting suspected child maltreatment, the reporting CDC Professional may only discuss the alleged incident with those involved in the reporting protocol detailed earlier in this chapter, which includes only the CDC Director, the FAR, Command, and/or an authorized investigator from CPS or law enforcement for the purposes of assisting in an assessment or investigation. Discussing confidential information outside of these parameters, including with other CDC Professionals (e.g., gossiping) or parents for reasons other than carrying out CYP functions, will result in disciplinary action.

## 4.2  Additional Management Team Reporting Responsibilities

Mandated reporters have a very specific and narrowly defined set of responsibilities when it comes to reporting suspected incidents of child maltreatment. In certain "critical incidents," the CDC Management Team has additional reporting responsibilities to keep both CNIC and NAEYC properly informed of situations at a Navy CDC program. This section details requirements and procedures for effective and appropriate reporting coordinated by the Management Team.

**Note:** FAP, CPS, Command, and CNIC have the authority to request, view, or obtain a copy of any relevant documentation to facilitate fulfilling their assessments or investigative duties.

### 4.2.1  CNIC Notification

The CDC Director must notify CNIC under the following circumstances:

▸ Any critical injury sustained by a child or youth in a CYP that resulted in the child being transported to a hospital Emergency Room or Urgent Care Facility for treatment (e.g., the youth was transported to an ER or Urgent Care Facility by Emergency Responders, parents, CYP Professionals or other individual);

> If the critical incident involves a violation of CYP policy, the CDC Director should immediately begin a CYP policy violation review (see Chapter 6: CYP Policy Violations).

▸ High-visibility incidents (that may attract media attention);

▸ Lapse in supervision;

▸ Alleged child maltreatment that involves multiple youth or multiple instances; OR

▸ Any child maltreatment allegations against CDC Professionals.

To complete this notification, the CDC Director must submit the *Incident/Accident Reporting Form— CNICCYP 1700/25* via email to CYPINCIDENT@navy.mil, **within 24 hours of a critical incident**.

The CDC Director **must** email the notification form and supporting documentation to the incident email inbox (CYPINCIDENT@navy.mil), which ensures timely CNIC notification even during staff absences. **Do not** fax the form or email it directly to an individual at CNIC. In the email report, the CDC Director must attach the notification form and document, at a minimum, the facts gathered and observed, any first aid applied or medical treatment the child received, and measures taken to ensure the safety of all children in the CDC. Additionally, the *Incident/Accident Reporting Form—CNICCYP 1700/25* must also be sent to the CYP Director (if different from the CDC Director) and the Regional Director for review **before** submission to CNIC.

Following the initial notification, the CDC Director must send status reports at least every 30 days via the Status Update/Closure Form section of Form 1700/25, detailing all significant follow-up actions and information (e.g., additional witnesses and witness statements, medical treatment updates, corrective actions and additional protocols implemented to reduce future risks), until the case is closed and/or resolved. Upon closure and resolution, the CDC Director shall send a final report to notify CNIC that the case has been closed or resolved by completing the closure section of the form and submitting it via email.

## 4.2.2   NAEYC Notification

To ensure accountability for the quality associated with National Association for the Education of Young Children accreditation, NAEYC requires notification about any "critical incidents" in which a child's welfare may have been jeopardized per NAEYC Required Criteria Policy. Because NAEYC accreditation is a requirement of the Military Child Care Act of 1989, high program quality and NAEYC accreditation are essential to the ongoing operation of CYP. The loss of accreditation status is very serious for a CYP. Failure to safeguard the well-being of a child in care may constitute cause for revocation of accreditation because it undermines program quality and child safety.

Consequently, all CDCs **must** notify NAEYC of all "critical incidents" *within 72 hours*.

### *72-Hour Notification Form for Critical Incidents*

All child development programs certified by DoD and accredited or pursuing accreditation with NAEYC must report the occurrence of a "critical" accident/incident meeting criteria 1.B.09, 3.C.02, 3.C.04, 3.C.05, 5.A.03, 5.A.12(a), or 10.B.04, as well as any other situations that jeopardize the life, health, or safety of a child. NAEYC considers all of the following "critical incidents:"

▶  Suspension/revocation of an operating license (attach copy of notice);

▶  Death of a child;

▶  A critical injury to a child that results in the child being admitted to a hospital emergency room for treatment (whether transported by the Emergency Medical Response Team, the program, a parent, or another individual) (**Note:** A critical injury places life in jeopardy; produces unconsciousness; results in a substantial loss of blood; involves the fracture of an arm or a leg; involves the amputation of a leg, arm, hand, or foot; consists of burns to a major portion of the body; or causes the loss of sight in an eye.);

▶  An unusual incident involving a lack of supervision (e.g., a child being left unattended or a child leaving the facility alone or in the care of an unauthorized individual);

▶  Suspected child maltreatment that occurs at a CYP or by an employee or individual that the child met through CYP; and

▸ Any other incident that compromised (or could have compromised) the essential health or safety of any child.

CDC Directors should follow these steps to ensure proper and complete submission of the form:

**Step 1:** The CDC Director must submit the *Incident/Accident Reporting Form—CNICCYP 1700/25* to CNIC via email at CYPINCIDENT@navy.mil, **within 24 hours of the incident occurring** (see previous section for instructions).

**Step 2:** CNIC will assist the CDC Director in determining whether the incident meets the required criteria for 72-Hour Notification for NAEYC.

▸ If it is determined that the incident **meets** this criteria, the CDC Director proceeds to **Step 3.**

If the incident does not meet this required criteria, the CDC Director should proceed with a CYP policy violation investigation and implement appropriate corrective and/or personnel action (see Chapter 6: CYP Policy Violations).

**Step 3:** The CDC Director must complete the *NAEYC 72-Hour Notification Form*.

**Step 4:** Once the form has been completed, the CDC Director must immediately request that the CYP Director and Regional Director review the notification form for accuracy **within 24 hours**. Once the draft has been *finalized* (e.g., reviewed by the CYP Director and Regional Director), it should be sent to CNIC for a final review. This final draft should be sent to CNIC with enough time to review before the NAEYC deadline, preferably 48 hours before the deadline. If, for some reason, a CNIC review is unavailable within the 72-hour timeframe, the CDC Director must submit the form to NAEYC to meet the 72-hour reporting requirement.

**Step 5:** The CDC Director must email the *NAEYC 72-Hour Notification Form* using the submission instructions on the form within 72 hours of the incident.

After NAEYC receives the *NAEYC 72-Hour Notification Form*, the program will receive an email confirmation. Both the primary and secondary contacts listed on the NAEYC application will be contacted by NAEYC via email within 10 to 14 business days requesting additional documentation to further assess the reported critical incident. This email will communicate deadlines for submission of any additional documentation, if requested.

**Reminder:** The CNIC CDC Program Coordinator should be listed as the secondary contact on the CDC's NAEYC application.

## Additional Documentation Requests

The following sections describe additional documentation that may be requested by NAEYC to assess critical incidents and their impact on program quality standards. NAEYC requests such documentation to assess the Management Team's response and due diligence in addressing, clarifying, and mitigating any gaps or failures in policies and procedures that may have led to a critical incident and potentially undermined program quality standards. All additional documentation must be provided within the required timeframe set by NAEYC. In the event of a critical incident, the CDC Director should begin to prepare the

documentation packet **in advance of any request** to ensure that they meet all submission deadlines in the event that a request is made.

**Example: Supporting Documentation for Allegation of Institutional Abuse**

▸ *Incident/Accident Reporting Form—CNICCYP 1700/25* (with personal information removed) submitted on the day in question;

▸ Enclosures of current policies in place at the time of the incident:

  - OPNAVINST 1700.9E, Chapter 15, Child Abuse Prevention and Reporting;

  - These CDC CAPER Standards;

▸ Photo of the location where the incident took place including a description of what the assessor will be reviewing in proximity to the classroom location (may be included on the program's response letter); and

▸ Investigation or status reports completed by FAP, CPS, Safety Office and/or Human Resources (HR), with the names of all parties removed (e.g., notate as Teacher A or B).

**Example: Supporting Documentation for Lapse in Supervision Incident**

▸ *Incident/Accident Reporting Form—CNICCYP 1700/25* with personal information removed and submitted on the day in question;

▸ Enclosures of current policies in place at the time of the incident:

  - Accountability and supervision policies and procedures, such as head count procedures; procedures for checking sleeping infants and children and a blank copy of a Ratio Sheet and Classroom Attendance Roster;

  - Local SOP for Accountability and Supervision;

▸ Photo of the location where the incident took place, including a description of what the assessor will be reviewing in proximity to the classroom location (may be included on the program's response letter); and

▸ Investigation or status reports completed by FAP, CPS, and/or HR, with the names of all parties removed (e.g., notate as Teacher A or B).

**Corrective Action Plan**

In the context of **critical incident reporting**, NAEYC **may** request the formal submission of a Corrective Action Plan after reviewing a CDC's *NAEYC 72-Hour Notification Form*. A Corrective Action Plan is an essential tool aimed to thoughtfully assess the circumstances surrounding **any** accident or incident of CYP policy violation and to identify concrete strategies to prevent its recurrence. Because mitigating the recurrence of **any** accident or incident that places a child's well-being and/or a CDC's program quality and integrity at risk is of the utmost importance, completion of a Corrective Action Plan is an internal requirement following the occurrence of **any kind** of accident or CYP policy violation, regardless of the severity. A full description of Corrective Action Plans, including the purpose and essential components is included in *Section 6.2.2*).

Regarding preparation of a Corrective Action Plan for critical incident reporting, the CDC Director should consider the following:

▸ The Corrective Action Plan should be formally submitted to NAEYC ***only when requested by NAEYC***.

▸ If NAEYC requests a Corrective Action Plan, the CDC Director first must submit the Plan to CNIC for review and guidance before formal submission to NAEYC. The CDC Director should submit the Plan at least 3 days prior to the response deadline provided by NAEYC to allow sufficient time for review. However, because the CDC Director has ultimate responsibility for fulfilling all CDC accreditation requirements, including meeting the NAEYC's response deadline, he/she may have to submit the Corrective Action Plan without CNIC input if the Plan was not prepared quickly enough for CNIC review.

▸ For the purposes of NAEYC submittal, the Corrective Action Plan should be prepared on official letterhead.

▸ For reference, [Appendix B](#) provides a sample Corrective Action Plan for NAEYC submittal.

**Note:** Personal statements made by employees and/or parents should not be included as supporting documentation for NAEYC. These personal statements are internal documents used by the investigating agencies to assist in determining the facts related to the case.

Although these documentation examples represent common NAEYC requests and can help the CDC Director prepare submission packets, CDC Directors must ensure that they review and comply with NAEYC's particular requests for each critical incident. **Programs that disregard or delay reporting critical incidents and/or supplying supporting documentation to NAEYC could jeopardize their accreditation status.**

NAEYC will then review the information packet provided by the CDC Director, make its determination, and notify the CDC Director of the decision, which may include a site visit, accreditation revocation, or no action (i.e., affirming that the CDC Director's Corrective Action Plan is satisfactory).



# Chapter 5: Child Maltreatment Assessments, Investigations, and Communication Procedures

This chapter provides an overview of events that typically follow the report of child maltreatment via the mandated reporter process. More specifically, this chapter describes what a CDC Professional may expect from the CPS investigations and FAP assessments, the immediate actions that a CDC Director must take following a report of suspected institutional abuse by a CYP Professional, and the appropriate communication protocols that CDC Directors and CDC Professionals should follow both during the investigation and following the conclusion of the FAP assessment and CPS investigation.

**Note:** If an allegation of institutional abuse is made against a member of the CDC Management Team, all of the same process described in this chapter and in Chapter 6: CYP Policy Violations apply.

## 5.1 FAP Assessments and CPS Investigations

Once a report of child maltreatment has been made and a case has been opened, both the FAR and CPS immediately start independent assessments and investigations into the reported allegations. This section gives a general overview of the FAP assessment and CPS investigation processes and describes what the CDC Professional may expect from the process.

- FAP receives all reports of suspected child maltreatment and assesses the allegations in coordination with CPS. Because FAP has jurisdiction for incidents associated with the installation, it works with the installation's Command Judge Advocate on the legal implications. For all cases alleging child sexual abuse in a CYP- or DoD-sponsored activity, FAP immediately notifies the Command and CNIC.

- During the assessment and investigation process, CPS and the FAR may contact the CYP Professional who submitted the report to obtain additional information. The CYP Professional should be prepared to answer additional questions. Other than this, the CYP Professional has no other obligations regarding the case.

- The Fleet and Family Support Center uses an Incident Determination Committee (IDC) and Clinical Case Staff Meeting (CCSM) process to review child maltreatment cases. The installation multi-disciplinary IDC reviews the case and determines whether the allegations meet criteria for child maltreatment. In cases of institutionalized abuse, the IDC Chair will invite the CDC Director to participate on the IDC. In such circumstances, either the Installation CYP Director or CDC Director will be designated to serve the IDC and is responsible for providing information to the IDC about the incident in question.

> The IDC should be convened within 60 days of a report of child maltreatment.

In order to maintain child and family privacy, FAP and CPS have no obligation to update CDC staff once a non-institutional abuse report is made. FAP assessments and CPS investigations are confidential.

### *Legal Inquiries and Review Requirements*

If a patron or any outside entity would like to review CCTV footage pertaining to an allegation of child maltreatment or a violation of Navy CYP policy, they must submit a written request directly to the CDC Director. The Director must then gain approval for the request from the installation's Office of the Judge Advocate General (OJAG) before releasing any footage. Failure to vet such requests through the OJAG could not only violate confidentiality requirements, but it could also put the Navy at unnecessary risk if an involved party files a lawsuit.

The CDC Director may release CCTV videotapes or other material evidence to FAP, CPS, and law enforcement entities upon request. The CDC Director may consult with OJAG before releasing evidence to these investigating entities; however, such consultation is not required.

## 5.2  Immediate Action Required by the CDC Director

### 5.2.1  Staff Removal/Reassignment in Reports of Institutional Abuse

If an allegation of institutional abuse is made against a CDC Professional in the program, the CDC Director must ***immediately*** remove that staff member from the program, for at least the duration of the investigation. This action is an important prevention measure to protect the safety and well-being of both the child(ren) involved in the suspected incident and the other children in the CDC program. This action also protects the accused CYP Professional, allowing an investigation to proceed.

Immediately after being informed about a report of alleged institutional abuse, the CDC Director must inform the CDC Professional implicated in a report of child maltreatment that an allegation was made against him/her. The CDC Director will inform the CDC Professional that temporary reassignment or administrative leave is immediately required. The CDC Director must work with HR and other installation agencies to temporarily reassign the CDC Professional **outside** of CYP (to a position in which they would not interact with children) during the investigation. An implicated CDC Professional **may not** remain on the grounds of any CYP during the investigation in any role, including any support functions, such as food preparation, reception, or administration.

> When the CDC Director receives notice that a CYP Professional allegedly committed institutional abuse, the CDC Director must ***immediately*** remove the CYP Professional from the program.

The CDC Director may inform the CYP Professional in question that FAP will be contacting him/her for the purposes of the investigation.

Additionally, the CDC Director must immediately notify the local Chain of Command of the allegation of institutional abuse and the removal of staff.

**Note:** All CDC personnel matters are confidential. For additional guidance regarding personnel actions, see the next chapter, as well as the *CYP Staff Management Operating Manual (*when published).

### 5.2.2  CDC Director Review Responsibilities

Although FAP and CPS conduct a coordinated assessment and investigation in institutional abuse cases, they focus on the alleged victim's safety and rehabilitative services for the family; they do not make any recommendations or decisions related to CDC program corrective action or CDC Professional personnel actions.

When a report of child maltreatment by a CDC Professional is made, FAP will formally notify the CDC Director of the report unless the report is made directly by the CDC Director. As soon as the CDC Director is informed of the report, either by FAP or otherwise, the CDC Director should immediately initiate a Navy CYP policy violation review so that he/she may be prepared to recommend both program corrective action and personnel actions in a timely manner (see Chapter 6: CYP Policy Violations). Regardless of whether the case meets the criteria of child maltreatment by FAP or is substantiated by CPS, the CDC Director is required to determine whether the reported act violated Navy CYP policy. CDC Directors **should not** wait until FAR and CPS report their findings to start a policy violation review. The CDC Director should be working on a review at the same time that CPS and FAP are working through their internal assessments and investigations. Allegations of institutional abuse by a CDC Professional that do not meet the criteria for child maltreatment at the conclusion of FAP/CPS involvement will be referred back to the CDC Director for further action with regard to the policy violation (see Chapter 6: CYP Policy Violations). In such cases, the CDC Professional may return to the program and there must be no delay in taking the appropriate corrective and/or personnel action to prevent any further policy violations.

**Note:** During their policy violation review, the CDC Director must take care not to interfere with the FAR assessment or CPS investigation.

For more information on the CYP policy violation review process, see Chapter 6: CYP Policy Violations.

## 5.3  CAPER-Related Communication

### 5.3.1  Familial and Extra-Familial Abuse

If a CDC Professional reports child maltreatment by a parent/caregiver, it is FAP's responsibility to notify that parent. The CDC Professional **should not** inform the parent/family of any report.

CDC Professionals are required to practice confidentiality at all times. If approached by a family member associated with the allegation, the CDC Professional should refer the family to the CDC Director. The CDC Director should not disclose that a report was made by a CDC Professional and should defer to FAP if the family has any questions. If the report was made by the CDC Director, he/she should refer questions to FAP.

> To maintain child and family privacy, FAR and CPS have no obligation to update CYP staff once a non-institutional abuse report is made. CYP Professionals **are not** permitted to discuss the report with the family.

Parents who are not connected to an allegation of familial or extra-familial abuse **will not** be notified or informed about allegations of *familial* or *extra-familial* child maltreatment involving another child in the program.

## 5.3.2   Allegations of Institutional Abuse

### Communication With the Alleged Victim's Family

When there is an allegation of institutional abuse, the CDC Director, FAP, and CPS have distinct communication responsibilities. In order to properly balance parental rights against the child's right to safety, only the CDC Director, FAP, or CPS have the authority to speak with the parents regarding allegations involving their child. Furthermore, only the CDC Director, FAR, and CPS staff have sufficient professional experience to prepare them to sensitively discuss

> Only the CDC Director, FAP staff, and CPS have the authority to notify an alleged victim's parents of institutional abuse allegations.

allegations with the parents and to handle parental concerns, questions, and reactions appropriately. No other CDC Professional may notify an alleged victim's parents or speak with the parents regarding the report.

For all allegations of institutional abuse, the CDC Director must inform the alleged victim's parents of operational procedures and safeguards that have been deployed to address the alleged incident in the CDC program. The CDC Director's notification should include the following additional points:

- Assure the parents that all allegations are taken seriously and the matter will be thoroughly investigated by the appropriate authorities.

- Inform the parents that, per Navy policy, the CDC Professional implicated in the allegation has been immediately removed from CYP until the investigation yields a determination.

- Indicate that the parents will receive more specific information from either FAP or CPS regarding the allegation and the investigation, and they will be contacted by FAP, CPS, and the CDC Director when the matter has been closed or resolved.

- Explain, as needed, that the CDC will not be able to discuss specific personnel actions or decisions with the parents.

The CDC Director should coordinate the parental notice with FAP and CPS to avoid interfering with their investigations. FAP will inform the parents of the nature of the allegation and next steps to be taken in the investigation.

When FAP and CPS have completed their assessment and investigation processes, they will inform the family of the outcomes. The CDC Director should follow up to underscore any corrective action that will be put in place to ensure child safety and well-being moving forward.

**Alleged Institutional Sexual Abuse:** Cases of alleged child sexual abuse by a CDC Professional require a slightly different communication protocol. In all cases of child sexual abuse, FAP, rather than the CDC Director, leads and conducts the notification process. However, FAP should involve the CDC Director in the family notification process. The CDC Director will notify the family that an allegation of inappropriate interaction was made and that per Navy policy, the CDC has removed the staff member from the program during the duration of the investigation. The CDC Director will not inform the family that the allegation was of sexual abuse. FAP will inform the family about the specific nature of the abuse.

## Communication With CDC Staff and the Other Families

In allegations of institutional abuse against a CDC Professional, the parents of children who were not the alleged victims **are not** notified of the report. CDC Professionals are prohibited from discussing or notifying family members or other staff members about an allegation or ongoing investigation.

The following statements are appropriate for responding to families' questions about a CDC Professional's absence or rumored allegations:

- "We maintain every child's and employee's right to confidentiality in our program, and so I am sorry that I cannot answer your question or concern. You can be assured that we are doing everything possible to ensure that all children have a positive and safe experience in our program."

- "We protect all employees' personnel information. Our Director is available to talk with you about any concerns."

- "We cannot share information about any specific allegation, but we can share our general policies and procedures. Do you have a general question that I can ask our Director so that I can get back to you with an answer?"

- "The matter is confidential. I am sorry that I can't share information with you."

Families may make assumptions or draw their own conclusions about these situations. However, it is not appropriate for any CDC staff member to confirm, deny, or otherwise discuss allegations, personnel situations, decisions, and actions with the other families. All reports, investigations, and personnel actions are confidential.

If, during the course of an investigation, FAP determines that other children were affected by the inappropriate actions of a CDC Professional, those families will be contacted by both FAP and the CDC Director.

**Follow-Up If Report Meets Criteria for Child Maltreatment:**

**CDC Staff:** The CDC Director should meet with staff to inform them about the case results and discuss program corrective action plans to prevent such an incident from occurring in the future (see Chapter 6: CYP Policy Violations).

**Program Families:** If the investigation determines that institutional abuse did indeed occur, FAP will inform the CDC Director. The CDC Director will inform program parents of the following:

- There was a report of child maltreatment involving a CDC Professional.

- Per Navy CYP policy, the CDC Professional was removed from the grounds immediately following the report and during the investigation.

- Following an assessment and investigation, this report was found to meet the criteria for child maltreatment. As such, the CDC Director has taken measures, in coordination with HR, Labor Relations, FAP, and CPS, in accordance with Navy policy, to maintain the safety of the children and initiate any prescribed personnel and corrective actions.

It is appropriate to assure these families that their children were not involved in any incident and that the program is dedicated to ensuring their children's safety. The CDC Director may inform parents of any changes in policy or procedures that have been put in place to enhance child safety in the CDC.

## Media Inquiries

The local Public Affairs Office (PAO) is the official media contact for incidents occurring in CYPs and elsewhere on Navy installations and has overall responsibility for handling inquiries from the press. Following a report that may generate media attention, designated FAP staff will coordinate with the command and regional program staff to notify the PAO as soon as possible, but no later than 24 hours after the report. As described in Chapter 4: Reporting, the CDC Director must notify Command and CNIC of any critical incidents that may generate media attention within 24 hours of the incident.

# Chapter 6: CYP Policy Violations

The most common forms of staff misconduct fall within the realm of Navy CYP policy violations. Subsequently, most reviews conducted by the CDC Director will focus on Navy CYP policy violations rather than allegations of institutional abuse. However, **all** substantiated allegations of institutional abuse fall squarely in the realm of policy violations. Because compliance with policy is integral to continuing program quality and NAEYC accreditation standards, the CDC Director must investigate and review all suspected violations of Navy CYP policy and determine a course of action to both mitigate and prevent further violations and identify strategies for continued program improvement.



This chapter describes the process for reviewing and resolving Navy CYP policy violations.

## 6.1  CYP Policy Violations and Review Process

A CYP policy violation refers to any failure to implement, follow, adhere to, or comply with any of the Navy CYP policies referenced in these Standards including, but not limited to, the following:

‣ *CDC Interactions and Relationships Standards*

‣ *CDC Accountability and Supervision Standards* (once published)

‣ *Navy CYP Guidance and Touch Policy*

‣ All guidance contained in these Standards

### 6.1.1  CYP Policy Violation Scenarios

This section presents three scenarios, each presenting different degrees of CYP policy violations ranging from no policy violation to a clear and severe violation of CYP policy. These scenarios are designed to show how the material presented in Chapters 1, 2, and 4 may be applied.

**Scenario A**:

Part 1: A child's shoe came off during playtime. The classroom Teacher Z picks up the shoe and tosses the shoe back to the child so that he may put it back on his foot.

‣ This incident **does not** violate any Navy CYP policy nor does it meet any indicators of child maltreatment. No action is required.

Part 2: A child's shoe came off during playtime and he refuses to put it back on. Teacher Z asks him several times to put his shoe back on, but he yells "No." Teacher Z gets frustrated and tosses the shoe at the child and yells "Put your shoe on now!" The shoe doesn't hit the child but it scares him.

‣ In contrast to Part 1, the Teacher's actions described in Part 2 do, in fact, violate appropriate interactions policy (see the *CDC Interactions and Relationships Standards*). As such, the CDC Director should start an official CYP policy violation review and take appropriate corrective and personnel action, if needed, per CYP Policy Violations protocol (described in this chapter). Because the child was not harmed in the incident, this scenario does not meet the indicators of child maltreatment and, as such, does not require mandated reporting to CPS and FAR, or submission of an *Incident/ Accident Reporting Form—CNICCYP 1700/ 25*.

**Scenario B**:

Teacher Assistant Bravo is supervising the children as they play on the swings. A 3-year-old girl walks in front of the swings as other children are swinging. Teacher Assistant Bravo runs and grabs the child's arm and pulls her back to prevent her from being hit in the head by a swinging child. The girl is uninjured but shaken up. Teacher Assistant Bravo then reminds the child to "stop, look, and listen to stay safe." Teacher Assistant Bravo has no history of disciplinary action.

‣ Although Teacher Assistant Bravo did forcibly move the child out of the way of the swing, the scenario can be considered an extenuating circumstance because Teacher Assistant Bravo was clearly trying to keep the child from being harmed. Teacher Assistant Bravo was not acting negligently and was genuinely trying to protect the child. The CDC Director may want to use this incident as an opportunity to bolster the playground safety curriculum for the children and review playground supervision strategies with staff to prevent such an incident from happening again. The actions taken by Teacher Assistant Bravo, as described above, do not violate CYP policy.

**Scenario C**:

Teacher Assistant Tango is outside with her class during playtime. During this time, she is supposed to be supervising the children as they play on the outdoor equipment while Teacher Sierra is supervising the children in the sandbox. Teacher Assistant Tango takes out her cell phone and starts looking at something on her phone for several minutes, taking her eyes off of the children. A young preschooler who struggles with his gross motor skills tries to climb up on the slide. He has difficulty climbing and thus loses his balance and falls, breaking his wrist. Teacher Assistant Tango only realizes this when she hears him cry and the other children call out for help. The child is transported to the urgent care facility for treatment.

‣ In this scenario, Teacher Assistant Tango violated supervision policy (see *CDC Accountability and Supervision Standards,* once published). She failed to supervise the young preschooler and that lapse in supervision resulted in a serious injury to that child. This lapse in supervision resulted in harm to a child

and thus may meet the criteria for reportable child neglect (see Chapter 1: Introduction) and should be reported in good faith immediately per mandated reporter protocols (see Chapter 4: Reporting). Additionally, because the incident resulted in a broken bone that required transport for medical attention and constitutes an allegation of institutional abuse, CNIC and NAEYC must be notified per additional reporting requirements (see Section 4.2). If FAR/CPS decide to open a case review, the CDC Director should remove Teacher Assistant Tango from CYP pending conclusion of the FAR and CPS investigations into the incident (see Section 5.2). Concurrently, the CDC Director should begin an investigation into the violation in supervision policy and determine how such an incident can be prevented in the future.

## 6.1.2   The Review Process

The CDC Director must review and investigate all alleged Navy CYP policy violations by a CDC Professional, whether or not those violations also constitute institutional abuse. The purpose of the CDC Director review is threefold: (1) ensuring child safety and well-being within the CDC; (2) maintaining program quality; and (3) assessing, determining, and implementing both appropriate personnel action and program corrective action to mitigate further incidents.

The CDC Director must conduct an objective and thorough review of all facts, observations, and witness statements; document all information gathered or observed; and maintain a copy of all documentation. The CDC Director must contact HR before proceeding with the review to ensure that it is conducted according to Navy policy. A thorough review generally includes:

- Reviewing closed-circuit television (CCTV) recordings;
- Interviewing any witnesses and other CDC Professionals;
- Making independent observations and assessments of the subject CDC Professional and CDC operations; and
- Reviewing the CDC Professional's personnel file to identify patterns, issues, and other concerns.

In policy violation investigations, the CDC Director must document **in writing** all discussions and activities that occur. The CDC Director should describe *who* did *what, when, where,* and *how* when writing up the facts gathered and observed. It is essential to document all aspects of the review in writing to create a full, accurate, and detailed record of the incident. Such a record may be an important reference should another incident occur in the CDC or if the CDC Professional in question is implicated in another violation of policy. This written documentation may also prove invaluable in determining *appropriate* personnel action or program corrective action. For each person the CDC Director interviews as part of the investigation (including the employee who is being investigated), the CDC Director must write a summary of the interviewee's statement of facts, have the interviewee review it for accuracy, make necessary modifications, and then have the interviewee sign and date it. The CDC Director then must sign and date all final documents.

# 6.2  Actions to Mitigate Further Policy Violations

Following a complete policy violation review, the CDC Director must then determine how to mitigate and prevent further incidents and identify ways to improve relevant processes and procedures through a corrective action plan. Additionally, the CDC Director, together with HR, must also determine whether

disciplinary action is required for the employee who violated Navy policy and, if so, what kind of personnel action is appropriate.

## 6.2.1  Personnel Action

After the conclusion of the policy violation review, if the CDC Director concludes that the CDC Professional's actions indeed violated Navy CYP policy, the CDC Director must then consult with the HR point of contact for Labor Relations to determine the appropriate disciplinary action for the CDC Professional based on the nature of the incident and contributing or mitigating factors.

According to CNIC Instruction 5300.2 (Personnel Manual for All Commander, Navy Installations Command [CNIC] Non-Appropriated Fund [NAF] Operations), the CDC Director must use sound analysis and judgment to ensure that each disciplinary action fits the actual violation of Navy CYP policy. The CDC Director must also ensure that violations occurring under similar circumstances are treated similarly and that all disciplinary actions taken by the CDC Director fall logically along a continuum based on an analysis of the full situation and risk level involved.

In most cases of policy violations, the following factors should be considered when determining appropriate personnel action:

- Nature and seriousness of the offense on a continuum of possible policy violations;
- Employee's past disciplinary record and past work record (Is this an employee with an exemplary record to date or have there been issues in the past? Is there a pattern of personnel issues? How were past issues addressed or remediated?);
- Consistency in the disciplinary action imposed (Have others been subject to the same disciplinary action for the same or similar violations?);
- Mitigating circumstances surrounding the violation (Were there unusual circumstances that contributed to the CDC Professional acting in a way that he/she does not normally act?); and
- Verification that the employee was aware of the applicable policy and Standards and understood that the incident violated policy.

It is important to underscore that Navy CYP policy violations that pertain to the health and safety of children in care are considered very serious offenses. In such cases, as in instances of substantiated institutional abuse, above all else the CDC Director and HR must weigh the safety and well-being of the children in CYP care and any injury suffered by a child (both physical and emotional) as a result of the incident, including a CDC Professional's performance history. Past good performance, for instance, **may not** always mitigate violations of *CDC Interactions and Relationships Standards*, *CDC Accountability and Supervision Standards* (once published), and/or the *Navy CYP Guidance and Touch Policy*. The safety and well-being of children in care must be paramount in such determinations. Appropriate personnel action in such instances may range from suspension to termination depending on the severity of the incident and any physical or emotional injury caused to any children involved in the incident.

While HR maintains the original, formal notice of personnel action, the CDC Director must retain a copy of the formal notice in the CDC Professional's personnel file. The CDC Director must also document implementation and completion of the requirements of the personnel action, such as additional training or other remedial action. Following the determination of the personnel action, the CDC Director must

formally notify the CDC Professional of the personnel decision with a formal counseling statement, letter of reprimand, or other written notice of personnel action.

For additional guidance regarding personnel actions, see the *CYP Staff Management Operating Manual* (once published).

## Personnel Action Considerations in Cases of Investigated Institutional Abuse

The following sections describe personnel action considerations after a case has been **investigated** for insitutional abuse. Considerations are categorized based on whether or not the case was found to meet the criteria for institutaional abuse.

### Cases Found to Meet the Criteria for Institutional Abuse

When a case is found to meet the criteria for child maltreatment, the allegation has been confirmed based on a review of evidence and testimonies. If the IDC committee finds that the incident meets the criteria for institutional abuse, the IDC Chair will advise the CDC Director of the outcome at the time of the meeting. The CDC Director and the responsible Command will also receive a determination letter immediately following the meeting that should be shared with the CYP Professional.

> If a case is found to meet the criteria for institutional abuse, a report will also be forwarded to the Navy Central Registry, per current Navy FAP policy, creating a permanent record of the incident and its findings.

The IDC will inform the CDC Director of their risk assessment for the CDC Professional in question; however, they do not make any personnel decisions in substantiated cases of child maltreatment. The CDC Director, in collaboration with the Chain of Command and HR, determines any relevant personnel action based on the IDC's risk assessment and other factors.

If FAP finds that the case meets the criteria for institutional abuse, but it is determined that the conditions for termination are not met, the CDC Director must document all required activities (e.g., retraining or additional training) and actions (e.g., providing intensive coaching), and provide explicit instructions to ensure that all requirements are fulfilled. For example, instructions must explicitly state whether the employee must take (or retake) a training, who will provide the training, and the date by which the employee must complete the training. Additionally, the CDC Director must confirm through both verbal and written communication with, and observation of, the CDC Professional that the employee understands and demonstrates the implementation of all relevant Standards to comply with policy. In addition, since a report will be maintained in the Navy Central Registry if a case is found to meet the criteria for institutional abuse, documentation detailing why the CDC Professional implicated in the case was not terminated and permitted to continue working with children in Navy CYP must be maintained in the employee's file by the person responsible for adjudicating background checks. This documentation, along with a description of all corrective action requirements (as described above) and documentation that requirements were completed by the CDC Professional, must be included in the CDC Professional's personnel file which is retained by HR.

If the CDC Professional is not terminated and will be returning to the CDC after a case of substantiated institutional abuse, the CDC Director must contact the family and underscore that appropriate corrective action is being taken to prevent any further incidents and that their child's safety is paramount.

**Cases Found to Not Meet the Criteria for Institutional Abuse**

In cases in which institutional abuse is investigated but was not found to meet the criteria for child maltreatment, FAP will inform the Chain of Command of the final determination of the IDC because it may influence personnel actions (e.g., returning to the classroom, disciplinary actions). The IDC will communicate the final determination to the implicated CDC Professional as well.

Again, because the CDC Director should be reviewing any relevant policy violations concurrently with the FAP assessment and CPS investigation, the CDC Director should be ready to immediately implement any corrective and personnel action for the identified violation to mitigate and prevent future violations. Both personnel and program corrective actions should facilitate reintegration. At a minimum, reintegration should include:

▶ One-on-one mentoring and increased supervision by the CDC Director;

▶ Additional or refresher training for the CDC Professional in question, arranged by the Training Specialist in collaboration with the CDC Director; and

▶ More intensive monitoring and coaching for the CDC Professional in question.

During the reintegration period specified in the CDC Director's decision and instructions, the CDC Director must document the required activities (e.g., training) and actions (e.g., working with the Training and Curriculum Specialist and Lead Teacher through intensive coaching), and affirm through communication with, and observation of, the CDC Professional that the employee understands and demonstrates the implementation of all relevant Standards to comply with policy. This documentation will facilitate enforcement of all requirements.

The CDC Director must set the tone for a supportive work environment by maintaining an "open door" policy, and modeling and promoting nonjudgmental, collaborative interactions. The CDC Director must also communicate that all CDC Professionals must support the employee's reintegration and that gossiping or fostering negative work interactions will not be tolerated. Other CDC Professionals must remain nonjudgmental in their interactions with the returning CDC Professional so that they do not undermine the teamwork and collaboration required to uphold program quality.

For additional guidance regarding personnel actions, please see the *CYP Staff Management Operating Manual* (once published).

## 6.2.2   Corrective Action Plan

Child well-being and program quality are paramount to Navy CYP. Accordingly, CNIC requires that CDC Directors mitigate the recurrence of **any** accident or incident that places a child's well-being and/or a CDC program's quality and integrity at risk. A Corrective Action Plan is an essential tool that is aimed not only at preventing the recurrence of an accident or incidence of CYP policy violation, but also improving program quality and operations. To this end, the Corrective Action Plan identifies the root cause(s) of an accident or policy violation through the holistic review of **all** factors surrounding the incident in question and presents a clear and specific course of action to prevent recurrence (e.g., retraining, additional training, strengthened supervision, additional mentoring, and improvements to existing processes) and improve operations.

In order to ensure vigilant pursuit of risk mitigation, the completion of a Corrective Action Plan is an internal CYP requirement following the occurrence of **any type** of accident or CYP policy violation, regardless of the severity. Accordingly, CDC Directors should prepare a Corrective Action Plan **whenever** an accident or policy violation occurs. Completion of a thoughtful Corrective Action Plan provides assurance to relevant stakeholders that an accident or incident was properly and thoroughly investigated. As such, the completed Corrective Action Plan may be requested by a number of stakeholders at any time. As described in Chapter 4: Reporting, programs *may* be required to formally submit a Corrective Action Plan as part of the critical incident reporting process for NAEYC. Additionally, any element of the Chain of Command may also request a copy of a Corrective Action Plan to ensure that the program is safe and operating within standards. CDC Directors should be prepared for any such request.

The Corrective Action Plan should be used to inform the CYP policy violation review process. During this process, it is essential that the CDC Director examine all evidence to determine what, if any, program-related or operational deficits may have contributed to the violation in question. The policy violation review provides an excellent opportunity to not only ensure that all aspects of program quality are in place, but it also allows for assessment and continuous program improvement. To support this effort, a Corrective Action Plan should present a holistic assessment of both the circumstances surrounding the incident in question and the program environment. At a minimum, the Corrective Action Plan should include a thorough assessment of the following in order to identify the root cause:

▸ Assessment of **all** program safeguards to determine whether all are working optimally to ensure a high-quality program and child safety and well-being, such as facility access practices, personnel supervision and monitoring practices, two-person integrity policy adherence (e.g., LOSS and staff:child ratios), and other quality assurance procedures;

▸ Assessment of current training practices for staff to determine whether refresher training or additional new or ongoing training is required to mitigate future incidents;

▸ Assessment of staff mentoring practices to determine whether improvements or changes need to be made to improve peer-to-peer training, stress management support, and staff collaboration; and

▸ Assessment of the program work environment, including staff morale and investment, to determine whether environmental and/or leadership factors can be improved to create greater staff cohesion, communication, and positivity.

Once these program and operational factors have been assessed and deficits identified, the CDC Director must then define clear corrective strategies to address the identified deficits to mitigate the possibility of future policy violations. ***Each*** corrective strategy should:

▸ Identify the deficit the strategy is aiming to mitigate;

▸ Describe how the corrective strategy will mitigate the identified deficit ***and*** define its discrete goals;

▸ Provide instructions for implementation;

▸ Identify the personnel responsible for implementation; and

▸ Define timelines and dates for implementation.



# **Appendix A:** Additional Resources

**Child Welfare Information Gateway (CWIG):** CWIG is a service of the Children's Bureau, Administration for Children and Families, U.S. Department of Health and Human Services. It provides child welfare and related professionals, as well as the general public, with access to print and electronic publications, websites, databases, and online learning tools to help protect children and strengthen families. CWIG maintains a comprehensive online database of State-mandated reporting statutes. Additionally, the Children's Bureau funds the National Child Abuse Prevention Awareness Month initiative each April on the CWIG website, providing a host of resources, including publications and resource guides to bolster awareness.

**National Child Traumatic Stress Network (NCTSN):** Funded by the Center for Mental Health Services, Substance Abuse and Mental Health Services Administration, U.S. Department of Health and Human Services, and jointly coordinated by UCLA and Duke University, NCTSN's mission is to raise the standard of care and improve access to services for traumatized children, their families, and their communities throughout the United States. Resources include Ages and Developmental Stages: Symptoms of Exposure, which includes possible child behaviors, grouped by age, in response to violence or other trauma.

**Navy CYP E-Library:** The Navy CYP E-Library is designed as a one-stop resource for all CYP documents, current news, and popular resources, as well as access to the CYP external online systems and partners. Available documents include the *Incident/Accident Reporting Form—CNICCYP 1700/25* and the DoD Hotline Poster.

**Self-Care and Managing Stress (Handout/Tip Sheet):** This downloadable handout is part of the *Gender-Based Violence (GBV) Communication Skills Manual* curriculum, collaboratively developed by Family Health International, the Reproductive Health Response in Crises (RHRC) Consortium, and the International Rescue Committee. The handout is part of a section entitled, "Supporting the Service Provider."



# **Appendix B:** Sample Corrective Action Plan for NAEYC Submission

[PLACE ON OFFICIAL LETTERHEAD WITH PROGRAM NAME AND ADDRESS]

2 July 20XX

From:   [Name of Installation and Program]
To:       National Association for the Education of Young Children

Subj:    **Corrective Action Plan**

Ref:      (a) OPNAVINST 1700.9e
            (b) Accountability and Supervision Operating Standard
Encl:
            1)      Commander, Navy Installations Command (CNIC) CYP Notification Form
            2)      Photo of Incident Location

<u>Violation and Root Cause</u>
The incident resulted directly from the lack of supervision of CDC children during their release from the program due to the failure of Employees A and B to follow *CDC Accountability and Supervision* policies. Reference (a) and (b) outlines the requirements for accountability and supervision of children in all Navy Child and Youth Programs (CYPs) and Child Development Center Programs (CDC).

<u>Actions Taken Against Involved CYP Professional(s)</u>
1.   Per policy, Employees A and B were immediately removed from the program and suspended from working with children in any other Navy CYP program pending the Family Advocacy Program Incident Determination Committee's (IDC) review of the case. That review is scheduled for July 9, 201X.

2.   The undersigned Child Development Center (CDC) Director will implement disciplinary action against Employees A and B in collaboration with Human Resources. The undersigned will determine and document the final disciplinary action upon receipt of the IDC's case determination. The undersigned will provide follow-up to NAEYC once the IDC case determination is received.

**Corrective Strategies Taken and To Be Taken**

1. As a result of the current incident and identification of its root cause, the undersigned CDC Director met with all program staff to review the appropriate protocols as they relate to Accountability and Supervision. Although this was an isolated incident, program awareness is important to ensure there is not a programmatic breakdown in systems that support Accountability and Supervision.

2. To mitigate further incidents, all CDC Professionals will complete mandatory Accountability and Supervision training July 9–11, 201X, which will cover re-training on systems that support sight and sound supervision to include: headcounts, positioning, zoning and classroom sweeps. Additional measures have been implemented to ensure sight and sound is supported and executed for each age group served:

   a. Increased classroom visits will be made by Lead Teachers to ensure protocols for transitions, headcounts, staff zoning, and physical searches of areas are consistent before making transitions (e.g., from indoor to outdoor spaces and vice versa);

   b. Trainers will increase classroom observations and QA protocols to ensure protocols are consistent or to identify if additional training is needed; and

   c. Management team will increase classroom visits and QA protocols to ensure staff are supporting their roles and responsibilities in supporting accountability and supervision requirements.

**Items Requested**

As requested, the following material is attached, which are incorporated by reference herein:

- Enclosure 1 is the report form notifying our higher level authority, Commander, Navy Installations Command (CNIC), of the incident and the reports made to Child Protective Services (CPS) and the Family Advocacy Program (FAP). CNIC requires submission of this notification form when any institutional abuse is alleged. All identifying information has been removed.

- Enclosure 2 is a photo of the location where the incident occurred.

If you have additional questions with regard to the information provided, I can be reached at XXXX.